THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LONA R. GRIFFIN, Defendant-Appellant.

Fourth District   No. 4—01—1019

Opinion filed August 24, 2004.

Daniel D. Yuhas and Robert N. Markfield (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

William A. Yoder, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In June 2001, a jury convicted defendant, Lona R. Griffin, of first degree murder (720 ILCS 5/9—1(a)(2) (West 2000)) of her infant son, Joseph. The trial court later sentenced her to 25 years in prison.

Defendant appeals, arguing that (1) the trial court erred by (a) improperly instructing the jury on the definition of knowledge, (b) granting the State's motion *in limine* to exclude certain evidence, and (c) failing to conduct an inquiry when, several days after the jury rendered its verdict, the court received a letter stating that the majority of the jurors considered defense counsel to have been ineffective; (2) she received ineffective assistance of trial counsel because counsel failed to challenge the voluntariness of her confession; and (3) she did not knowingly waive her right to file a motion to reconsider sentence. Because we agree with defendant's first argument, we reverse and remand.

## I. BACKGROUND

In January 2001, the State charged defendant with first degree

murder, alleging that she knowingly performed the acts that caused Joseph's death when she forcefully pressed his face and chest into her chest, causing him to suffocate, knowing such acts created a strong probability of death or great bodily harm (720 ILCS 5/9—1(a)(2) (West 2000)). At defendant's June 2001 trial, the following evidence was presented that is pertinent to our decision in this case.

## A. Defendant's Calls Regarding Joseph

On January 23, 2001, defendant, then 20 years old, lived in a trailer in Bloomington with her boyfriend, Frederick Robb, and their two children, Jordan (born July 1, 1999) and Joseph (born December 22, 2000). They all slept in the same bedroom. Robb got up a little after 5 a.m. to go to work, and the others were still in bed. Defendant was lying on one side of the bed, and Jordan and Joseph were in the middle of the bed.

Around 6:20 a.m., defendant called Robb at the gas station where he worked and told him that Joseph was not breathing. She asked him what she should do, and he told her to call 9-1-1 and then call his sister, Stacy Nesby, who lived close by and knew cardiopulmonary resuscitation.

Defendant called 9-1-1 and reported that Joseph was not breathing. Emergency personnel arrived shortly thereafter and attempted to treat Joseph, whom they found to be in cardiac and respiratory arrest. They then transported him to a hospital.

When Joseph arrived at the hospital, he was not breathing, had no heart rhythm or blood pressure, and was not making spontaneous movements. He died the next day.

## B. Defendant's Initial Explanation for Joseph's Death

Defendant told one of the paramedics treating Joseph that she had been sleeping in bed with Joseph and Jordan, and when she woke up, Joseph was on the floor. She thought that maybe Jordan had knocked him off the bed.

Nesby talked to defendant at the hospital shortly after Joseph was brought in and asked her what happened. Defendant told Nesby that when she woke up, Joseph was on the floor, the bassinet was pushed away, and Joseph was not breathing. Defendant provided that same information to the emergency room physician. While in the hospital, defendant was given the opportunity to hold Joseph but declined. When the medical personnel told defendant that he was likely to die, she became very tearful and said, "I would never kill my babies."

## C. Defendant's Police Interviews

Bloomington police officers interviewed defendant extensively on

January 23, 2001. Defendant's first statement was tape-recorded and she later gave a videotaped statement. The videotape, which lasted around three hours, was played for the jury.

In her videotaped statement, defendant said that she and Robb had lately been arguing a lot, and she would move out of the trailer when Robb was too difficult to be around. However, she always returned after a day or two. Although Robb would occasionally drink, yell at her, throw things, shove her, and threaten to beat or kill her, he had never actually struck her. Defendant said that although Robb loved the children, she was their primary caretaker because Robb worked.

Defendant initially told police essentially the same story she had told medical personnel—namely, that she had awakened and found Joseph on the floor. When one of the detectives informed her that he had attended Joseph's autopsy and learned that he had been suffocated, defendant slowly began to change her story. At first, defendant stated that she "might have rolled over on [Joseph]. If I did[,] I didn't mean for it to happen." Defendant then said she was scared to say what happened and reverted to saying once again that she woke up and Joseph was lying on the floor. Then, without providing any details, she said, "I didn't mean to kill my son. I don't want anyone to think I did."

After a break in the interrogation, defendant informed the officers that she had been having a lot of stress from being the only person taking care of the children. The officers suggested that defendant had not been getting the help she needed, and defendant acknowledged that was true. Then the following colloquy occurred:

"[DEFENDANT]: I might have suffocated Joey.

[DETECTIVE]: Huh?

[DEFENDANT]: I might have suffocated him, I don't know.

[DETECTIVE]: You might have suffocated him?

[DEFENDANT]: Yes, I don't know.

[DETECTIVE]: How might have you suffocated him? Did you put your hand over his mouth?

[DEFENDANT]: No. If he moved him or anything.

* * *

[DETECTIVE]: And [defendant], you know it's not that you might have suffocated him. You did suffocate him.

[DEFENDANT]: I know, that's what I'm trying to say.

[DETECTIVE]: You did suffocate him[,] didn't you?

[DEFENDANT]: Through my feelings, I feel that I probably did.

[DETECTIVE]: Through what?

[DEFENDANT]: Through my feelings, I feel that I probably did.

[DETECTIVE]: Okay, how?

[DEFENDANT]: I have no clue."

Upon further questioning, defendant said that she "had a lot of frustration in [her]." She explained that after Robb left for work, Joseph began crying and was upset, and she could not get him to stop crying. After acknowledging again that she was the one who suffocated Joseph, the following discussion occurred:

"[DETECTIVE]: Did you hold him to your chest when he was crying to get him to stop crying?

[DEFENDANT]: For a few minutes I did.

[DETECTIVE]: Were you holding him really tightly?

[DEFENDANT]: Yes.

[DETECTIVE]: To where he couldn't breath?

[DEFENDANT]: I don't know. I might have.

[DETECTIVE]: How did he stop crying? Did he stop crying while you were holding him tight to your chest?

[DEFENDANT]: After a while yes. I am just so scared.

[DETECTIVE]: And you knew that something bad was wrong with Joey then, didn't you, when he stopped crying?

[DEFENDANT]: I called the ambulance and that (inaudible)."

At this point in the interrogation, the officers advised defendant of her *Miranda* rights (*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)). The officers then continued to question her, and the following colloquy occurred:

"[DETECTIVE]: Okay, *** you tell me if this is not correct or not. Yesterday morning after [Robb] got up and left for work, Joey started crying?

[DEFENDANT]: Yes, he did.

* * *

[DETECTIVE]: Did Jordan wake up when Joey started crying?

[DEFENDANT]: He woke up a little bit after.

[DETECTIVE]: He was kind of in and out?

[DEFENDANT]: Yeah.

[DETECTIVE]: In and out of sleeping. Was Joey really just wailing?

[DEFENDANT]: He was just crying.

[DETECTIVE]: I'm sorry?

[DEFENDANT]: He was crying.

[DETECTIVE]: I mean, really loud?

[DEFENDANT]: No, it wasn't really loud. It was, you know, a little bit louder than normal.

[DETECTIVE]: And you were getting frustrated?

[DEFENDANT]: Yeah.

[DETECTIVE]: And so what did you do?

[DEFENDANT]: The only thing I could do was lay beside him and hold him.

[DETECTIVE]: I'm sorry?

[DEFENDANT]: I said, the only thing I could do was lay him beside me and hold him. And I was holding him a little bit tight.

\* \* \*

[DETECTIVE]: Did you have Joey up on your chest when you were lying on your back?

[DEFENDANT]: Yes, I was [sic].

[DETECTIVE]: Did you have Joey's face in you[r] chest?

[DEFENDANT]: He was with his head right here.

[DETECTIVE]: Okay, was his face directly facing your chest?

[DEFENDANT]: It might have been.

[DETECTIVE]: And did you squeeze Joey really hard?

[DEFENDANT]: I didn't squeeze him really hard. I might have squeezed him a little too tight, but I didn't squeeze him really, really hard.

[DETECTIVE]: What do you mean, squeezing him too tight?

[DEFENDANT]: I mean, you know, hold him tighter than you normally do, but I didn't squeeze him really, really tight.

[DETECTIVE]: And why did you squeeze him tighter than you normally would?

[DEFENDANT]: Just to rock him.

[DETECTIVE]: To make him stop crying?

[DEFENDANT]: Yes.

[DETECTIVE]: Did you have it so his head, so his crying would be muffled? And understand, we understand what was going on in your life, were you very frustrated at that point?

[DEFENDANT]: Yes, I was.

[DETECTIVE]: Were you angry?

[DEFENDANT]: I was never angry angry but I was a [sic] frustrated. I was [a] little bit angry.

[DETECTIVE]: You were a little bit angry? Angry at Joey?

[DEFENDANT]: For him crying.

[DETECTIVE]: At the whole thing? Which is what we do, too. We get angry with our kids, you know?

[DEFENDANT]: I'm sure everybody does.

[DETECTIVE]: But you were angry because Joey was fussing, and you held Joey on top of your chest?

[DEFENDANT]: Yes[,] I did.

[DETECTIVE]: Did you have your hand on top of Joey's head?

[DEFENDANT]: No, I had them on his back area.

[DETECTIVE]: In the middle of his back pressing against your chest?

[DEFENDANT]: Yes.

[DETECTIVE]: Was Joe gasping from [sic] air?

[DEFENDANT]: I don't know.

[DETECTIVE]: Huh?

[DEFENDANT]: I don't know.

[DETECTIVE]: You were just trying to get Joey to stop crying, weren't you?

[DEFENDANT]: Yes, I was. I did not mean to kill my kid. I hope you guys understand that.

[DETECTIVE]: We understand that.

[DETECTIVE]: But at the same time we can't got [sic] half way now.

[DEFENDANT]: I know.

[DETECTIVE]: Okay, we have to get everything out there and be honest.

[DEFENDANT]: I understand.

[DETECTIVE]: You can't try to hold things back, okay?

[DETECTIVE]: But that's what happened, wasn't it?

[DEFENDANT]: Yes, it was.

[DETECTIVE]: Joey died because you were holding him against your chest, right?

[DEFENDANT]: (head nodding yes).

\* \* \*

[DETECTIVE]: What did you do with him once you realized there was a problem? Once you realize you're squeezing him, he stops crying, and then you realize something terrible, possibly. Do you know, what did you do with him then?

[DEFENDANT]: The only thing I can think of is that I might have dropped him. When I picked him up, I called [Robb] and I called the ambulance."

During additional interrogation, defendant explained further what happened:

"[DETECTIVE]: Was Joseph lying on the floor?

[DEFENDANT]: I, like I said, I think I dropped him after I was holding him.

[DETECTIVE]: I am a little bit confused, and we are going to go through every bit of this, okay? You were on the bed in the back bedroom?

[DEFENDANT]: Um hum.

[DETECTIVE]: And you were holding Joey close to your chest until he quit crying?

[DEFENDANT]: Um hum.

[DETECTIVE]: And you were squeezing him harder than you usually do?

[DEFENDANT]: Yes.

[DETECTIVE]: Did you find Joey on the floor, or did you just pick him up and carry him to the living room?

[DEFENDANT]: I was hysterical.

[DETECTIVE]: What?

[DEFENDANT]: I said I was hysterical, and I had dropped him.

[DETECTIVE]: In the bedroom?

[DEFENDANT]: Yes and then I had picked him up and carried him to the front room.

\* \* \*

[DETECTIVE]: Okay. Now what made you hysterical? If you didn't realize until after you dropped him that he wasn't breathing, why did you get hysterical enough that you dropped him?

[DEFENDANT]: Because I was scared I had killed him.

[DETECTIVE]: Because you were scared you killed him?

[DEFENDANT]: Yes.

[DETECTIVE]: Because of what? What did you notice that had made you think you had killed him?

[DEFENDANT]: I was holding him too hard, kind of.

[DETECTIVE]: I'm sorry.

[DEFENDANT]: Holding him too hard.

[DETECTIVE]: While you were holding him too hard, was he crying and moving?

[DEFENDANT]: Yes he was, for a few minutes.

[DETECTIVE]: At some point when you were holding him and he was tight, did he quit moving and quit making noise?

[DEFENDANT]: He quit crying.

[DETECTIVE]: Did he quit moving?

[DEFENDANT]: Yes, he did.

[DETECTIVE]: And \*\*\* is that why you thought he was dead?

[DEFENDANT]: Yes, it is.

[DETECTIVE]: Did he go limp?

[DEFENDANT]: Yes.

[DETECTIVE]: Kinda, and did you feel that?

[DEFENDANT]: Yes I did.

\* \* \*

[DETECTIVE]: When you were going through this frustration and all the terrible things that were going on, the problems with [Robb], the baby crying, and all the frustration was boiling over, and you grabbed him and you were squeezing him, what were you thinking?

[DEFENDANT]: I was thinking he'd be okay.

[DETECTIVE]: You were what?

[DEFENDANT]: I said I was thinking he'd be okay, but he wasn't. I was frustrated, yes.

[DETECTIVE]: When you do something, you do it for a reason. You grabbed him. You were squeezing him. Why were you squeezing him at that point, at that time?

DEFENDANT]: I was trying to get him to calm down.

[DETECTIVE]: Trying to get him to what?

[DEFENDANT]: Calm down.

[DETECTIVE]: Normal thing for somebody to do to get them calmed down is to put them in your arm and swing them and stuff like that, okay? So, is it calm down or just trying to make him stop?

[DEFENDANT]: I was trying to make him quit crying.

[DETECTIVE]: [Defendant], did you know what you were doing could hurt him?

[DEFENDANT]: No.

[DETECTIVE]: You didn't know what you were doing to him could hurt him?

[DEFENDANT]: No, I didn't.

[DETECTIVE]: You didn't know that squeezing...

[DEFENDANT]: Well I, yes, I did know that squeezing will hurt, could hurt. But I did not think I would.

[DETECTIVE]: You would what?

[DEFENDANT]: Hurt him."

The detectives then gave the defendant a doll so that she could demonstrate how she held Joseph on her chest. As she held the doll to her chest, the following discussion occurred.

"[DETECTIVE]: And as he continued crying?

[DEFENDANT]: I went like this to him.

[DETECTIVE]: Did you press harder and harder and harder?

[DEFENDANT]: A little bit harder, yes.

[DETECTIVE]: A little bit harder?

[DEFENDANT]: Yes.

[DETECTIVE]: As he continued, kept on crying, did you press harder and harder?

[DEFENDANT]: No, I didn't.

[DETECTIVE]: You just kept a constant...

[DEFENDANT]: Yes, I did.

[DETECTIVE]: Pressure against him? But more of a pressure than you knew was right, right?

[DEFENDANT]: Yes, it was.

[DETECTIVE]: And then was his head in your chest, do you know?

[DEFENDANT]: No, I don't.

[DETECTIVE]: You don't know. Was his crying muffled?

[DEFENDANT]: A little bit, yes.

[DETECTIVE]: And then you said that he went limp?

[DEFENDANT]: Yes.

[DETECTIVE]: And he stopped crying?

[DETECTIVE]: What I am wondering from what you're telling me is what you believe. Do you believe that you held his chest

down to where he couldn't breath, or that his face was held down so he couldn't breath?

[DEFENDANT]: I think it was his face.

[DETECTIVE]: It was his face, okay.

[DETECTIVE]: But were you also pressing on his back?

[DEFENDANT]: It wasn't hard hard, no.

[DETECTIVE]: Yeah, \*\*\* you know, Joey is one[ ]month old, and he is seven pounds. [I]t doesn't take a whole lot of pressure before you would be probably breaking bones and that kind of stuff. Joey is very fragile, right?

[DEFENDANT]: Yes.

[DETECTIVE]: But you were pressing him more than you knew you should have, right?

[DEFENDANT]: Yes, I was."

The detectives concluded their interview by asking defendant if she intended to harm Joseph, and she said she did not. "I would never hurt my kids," defendant stated.

The next day, defendant, who was then in custody in the McLean County jail, asked to speak with one of the detectives who had questioned her the previous day. Defendant told the detective that she had slept a lot and was feeling better. He asked her if what she had told them the day before was the truth, and defendant said it was. He asked defendant whether she had held Joseph to her chest and squeezed too hard until he stopped breathing, and defendant acknowledged she had.

## D. The Medical Testimony

The pediatrician who treated Joseph on January 23 and January 24, 2001, testified as follows:

"Joseph suffered from asphyxia, which is a form of suffocation, where he was not allowed to take a breath for some period of minutes, and he had some pressure either applied, probably applied to his chest, since there were no marks to his neck.

\* \* \*

Joseph was asphyxiated or held or squeezed or pressed between an object, two objects and \*\*\* not allowed to breath with enough force to force the blood out of his heart and back up into his head. \*\*\* After a period of a few minutes the lack of oxygen would cause him to stop breathing and eventually his heart would stop."

The forensic pathologist who performed the autopsy on Joseph opined that the cause of his death was nonaccidental asphyxia (suffocation). She also testified as follows:

"[A]s [a] person is struggling to breathe to get oxygen, especially if his nose and mouth are occluded, like would occur in a baby, there

is a struggle. And that's not very long, depending on if there is total occlusion. So the struggle might last 30 seconds, and then there would be loss of consciousness. But then to cause death one would have to maintain that [pressure] to prevent any oxygen from getting into the blood—into the brain. The brain would essentially die after many minutes, and then the brain anoxia, lack of oxygen, would cause the heart to stop. That would be the mechanism. So a person would generally lose consciousness after 30 seconds if the occlusion is acute, and if the person is struggling, a longer period of time, and then eventually [the person would] become limp, unconscious, comatose, dead.

Q. [BY PROSECUTOR]: Now, with an infant such as Joseph, will there still be struggling?

A. Yes, of course, he's not very weak [sic] and his neck muscles aren't very strong, but, yes, there will be a struggle. He will try to get air.

Q. Do you have an opinion based on your education, training, and experience to a reasonable degree of medical certainty as to how long it would take from the time of the onset of pressure to begin the asphyxiation until the time the heart would stop beating?

A. If the lack of oxygen is total, then at least four minutes for the brain to die, and then the brain death will cause the heart to stop. So, at least four minutes. Longer if there is struggle or incomplete prevention of oxygenation.

Q. And we're talking about that's how long that pressure has to be constantly applied. Is that correct?

A. Yes.

Q. Do you have an opinion based on your education, training, and experience, and examination, as to whether Joseph's injuries were caused by accidental or nonaccidental trauma?

A. They were nonaccidential."

## E. Defendant's Testimony at Trial

Defendant informed the jury that after Joseph's birth, she had heavy vaginal bleeding that occasionally made her dizzy. She weighed between 110 and 115 pounds after Joseph's birth, but six months later, at the time of trial, she weighed 138 pounds. She had called the hospital to ask what she could do about the heavy bleeding and was advised to lie down and relax. However, because she was taking care of two children, she could not do that.

In January 2001, defendant had a few family members who occasionally helped out with the children, but essentially she took care of them herself. Robb typically was either working or out drinking. Defendant wanted Robb to help with the children, but he would not. They argued almost every day about that.

Defendant testified that on the morning in question, Joseph had been crying, so she held him to her chest and "squeezed him a little, you know, but I didn't squeeze him too hard[,] and he went limp." She explained that she was squeezing him because "I was thinking it would stop him from crying." She did not know how long she squeezed him, but "[i]t wasn't long." When defendant applied pressure to Joseph's chest, he quit crying. Defendant said that the pressure she applied on Joseph's chest "was not hard," and she applied pressure only by her hands on his back. When she was asked if she continued to squeeze after that, she said, "Not that I know." On that morning, she had been bleeding heavily and "felt kind of dizzy."

Defendant acknowledged that the first time she told the story about applying pressure to Joseph's chest was when she spoke with the detectives at the police station. She explained that she did not initially report that fact because she was scared.

Defendant further explained that it was only a matter of a few minutes that she held Joseph tightly while he was crying. She also explained that she had not done that before. Her usual practice when a child was crying was to hold him and try to calm him. She did not know why she did not do that with Joseph on this occasion.

Defendant explained that she did not show any emotion at the hospital because she was scared she was going to lose her child. Later, when she was told Joseph was dead, she chose not to hold him because she wanted to remember him alive, not dead.

Defendant further testified that she saw the videotape of her interrogation by the police when it was played in court. She had nothing to change about her description of the incident as shown on the videotape.

The following colloquy then occurred between defendant and her trial counsel:

"Q. Now, when you applied the pressure to Joseph, did you intend to kill him at that time?

A. No, I didn't.

Q. Did you intend to cause him great bodily harm at that time?

A. No, I did not.

Q. Well, applying pressure to a baby, did you think you might harm him?

A. I thought I might have hurt him a little bit, but no, I did not intend to kill my kid, no."

On cross-examination, the prosecutor pointed out that defendant had just testified that the pressure she was applying to Joseph was not hard and asked whether that statement was true. Defendant responded that it was true, but then added, "It might have—it might

have been a little hard, but not too hard to intentionally hurt him, no."

Defendant then acknowledged that (1) Joseph was not her first child; (2) she knew the proper way to hold him to get him to stop crying; and (3) she knew that squeezing a baby was not the proper way to do that. She also agreed that it was "pretty much common sense" that she could possibly hurt Joseph "a little bit" by doing what she was doing.

On further cross-examination, the prosecutor elicited the following statements from defendant:

"Q. When you were in the bedroom standing next to the bed after you had held Joseph against your chest, and he stopped crying and stopped moving, and you indicated you were scared you might have killed him?

A. Yes, I was.

Q. What was it that made you think you might have killed him?

A. That he wasn't moving.

Q. Because you had held him too hard?

A. True, true.

Q. And in the tape you told [D]etective Shepherd that you—you did know that squeezing will hurt him or could hurt him?

A. True.

* * *

Q. And you told us that [the detective] asked you, did you press harder and harder and harder, and you said a little bit harder, yes. Is that true?

A. But not intentionally to hurt him, no.

Q. Pardon?

A. I said but not intentionally to hurt him.

Q. But you were pressing harder?

A. A little bit.

Q. And while you were holding Joseph against you, his crying was muffled?

A. Yes.

Q. Correct? And he did go limp?

A. Yes.

* * *

Q. And he did stop crying?

A. Yes.

Q. And you knew that you were pressing him more than you should have?

A. True."

### F. The Lesser-Included Offense

As earlier stated, the State charged defendant with first degree

murder, alleging that she knowingly performed the acts that caused Joseph's death when she forcefully pressed his face and chest into her chest, causing him to suffocate, knowing that such acts created a strong probability of death or great bodily harm to him. During the jury instructions conference, defendant asked the trial court to instruct the jury on involuntary manslaughter (720 ILCS 5/9—3(a) (West 2000)) as a lesser-included offense of first degree murder. The court did so over the State's objection.

During jury deliberations, the jury foreman submitted several notes to the trial court. The first of these notes, which is the only one pertinent to this appeal, requested clarification regarding mental states and is discussed in the next section of this opinion.

At the end of the first day of deliberations, the jury foreman informed the trial court that the jurors were split six-to-six as to first degree murder. The foreman stated that they had not yet considered the involuntary manslaughter charge.

The jury ultimately convicted defendant of first degree murder, and the trial court sentenced her as stated. This appeal followed.

## II. ANALYSIS

### A. The Jury Instruction Defining Knowledge

Defendant first argues that the trial court erred when it improperly instructed the jury on the definition of knowledge. Specifically, she contends that the court selected the wrong language from Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000) (hereinafter IPI Criminal 4th), in response to the jury's first note. The State responds that (1) defendant forfeited this argument by not including it in her posttrial motion, and the plain error rule does not apply; and (2) on the merits, the court did not err in responding to the jury's question. We agree with defendant and conclude that the court committed plain error.

### 1. *The Issues Instructions and the Definition of Recklessness*

The trial court instructed the jury on both first degree murder and involuntary manslaughter. Those instructions read, in pertinent part, as follows:

"To sustain the charge of first degree murder, the State must prove the following propositions:

First Proposition: That the defendant performed the acts which caused the death of [Joseph]; and

Second Proposition: That when the defendant did so, he [*sic*] knew that his [*sic*] acts created a strong probability of death or great bodily harm to [Joseph].

\* \* \*

To sustain the charge of involuntary manslaughter, the State must prove the following propositions:

First Proposition: That the defendant performed the acts which caused the death of [Joseph]; and

Second Proposition: That the defendant performed those acts recklessly; and

Third Proposition: That those acts were likely to cause death or great bodily harm."

These instructions are derived from IPI Criminal 4th Nos. 7.02 and 7.08, respectively.

The trial court also instructed the jury on the definition of recklessness, found in IPI Criminal 4th No. 5.01, as follows: "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

### 2. *The Jury Note*

During its deliberations, the jury sent the following note to the trial court: "The jury would like to know why knowing is not the same as intention [*sic*]. How can you know what you are doing and not intend it?" In response, the court determined that it would give the jury IPI Criminal 4th No. 5.01A, defining intent, and an instruction from IPI Criminal 4th No. 5.01B, defining knowledge.

### 3. *Instruction 5.01B*

IPI Criminal 4th No. 5.01B, defining knowledge, contains three separate paragraphs, but only paragraphs 1 and 2 are pertinent to this case. Paragraph 1 deals with knowledge in terms of prohibited conduct. Paragraph 2 deals with knowledge in terms of a prohibited result. When the trial court determined that IPI Criminal 4th No. 5.01B should be given, it asked the parties for their positions regarding which paragraph should be used. The State suggested paragraph 1. Defendant argued that because the issue was not defendant's conduct but the result of her conduct the court should instruct the jury using paragraph 2. The court agreed with the State and gave paragraph 1. This was error.

The paragraph of IPI Criminal 4th No. 5.01B the trial court gave reads as follows: "A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists."

The alternative paragraph that defendant asked the trial court to

give reads as follows: "A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct." IPI Criminal 4th No. 5.01B(2).

The committee note to IPI Criminal 4th No. 5.01B provides, in pertinent part, as follows:

"In cases where the instruction is given, use paragraph [1] if the offense is defined in terms of prohibited conduct. Use paragraph [2] if the offense is defined in terms of a prohibited result. If both conduct and result are at issue, use both paragraphs [1] and [2]. *See People v. Lovelace*, 251 Ill. App. 3d 607, [621,] 622 N.E.2d 859, [868,] 190 Ill. Dec. 829 (2d Dist. 1993), where the trial court committed reversible error by giving the jury only paragraph [1], and not both paragraphs [1] and [2], when both conduct and result were at issue." (Emphasis omitted.) IPI Criminal 4th No. 5.01B, Committee Note, at 142.

In *Lovelace*, a jury convicted the defendant of aggravated battery. The jury had been instructed on the definition of "knowingly" with regard to conduct. The trial court refused to instruct the jury on the definition of "knowingly" with regard to result. During its deliberations, the jury sent a note to the court indicating that it was confused about the definition of "knowingly." The court responded to the jury that it should follow the instructions that it had been given. The appellate court concluded that both conduct and result were at issue because the indictment charged defendant with both aggravated battery by knowingly causing great bodily harm and aggravated battery of a peace officer with the underlying battery based on knowingly causing bodily harm. *Lovelace*, 251 Ill. App. 3d at 619, 622 N.E.2d at 867. Thus, because the State was required to prove both that (1) defendant's conduct was performed knowingly and (2) defendant knew the likely result of his conduct, the trial court erred by refusing to give the second paragraph of IPI Criminal 4th No. 5.01B. Further, the appellate court concluded that error prejudiced defendant. The appellate court reasoned that the jury's question suggested that the jury may have found the defendant guilty of the aggravated battery even if it had found that the defendant did not know that his conduct was likely to cause great bodily harm. *Lovelace*, 251 Ill. App. 3d at 619-20, 622 N.E.2d at 867-68.

Citing *Lovelace*, defendant contends that "[t]he 'knowing' element to be established in proving knowing murder clearly pertains to prohibited result, rather than to prohibited conduct." We agree.

*4. The Need for Paragraph 2 of IPI Criminal 4th No. 5.01B*

A comparison of the issues instructions submitted to the jury

shows that the first propositions for both first degree murder and involuntary manslaughter are identical. Further, the record shows no dispute between the parties over whether "defendant performed the acts which caused the death of [Joseph]," which is the language of the first proposition. Indeed, the State and defendant are in essential agreement as to what defendant did and how she did it. The only disagreement concerns defendant's mental state as she performed those acts—that is, did she perform them recklessly (involuntary manslaughter), or, when she performed those acts, did she know that they created a strong probability of death or great bodily harm to Joseph (first degree murder)?

That the jury focused on defendant's mental state and sought clarification on that issue from the trial court should come as no surprise under these circumstances. Yet, regrettably, the State throughout this trial and during the conference on instructions asserted that no mental-state issue was present. The court apparently found this assertion persuasive when it declined to give paragraph 2 of IPI Criminal 4th No. 5.01B. The court's decision is all the more peculiar because, a few hours earlier, when it overruled the State's objection to instructing the jury on the lesser-included offense of involuntary manslaughter, the court provided an explanation that revealed it understood that defendant's mental state was the real issue in this case:

"[I]nvoluntary [manslaughter] has the same language that is pled in this case [in the first degree murder charge], and that is that the conduct was likely to cause death or great bodily harm. The only difference is the State alleges it was knowing, and the defense is suggesting it was reckless. So we're left with likely to cause death or great bodily harm, the acts were performed by the defendant. That's undisputed.

The question is whether they were performed recklessly under the definition of recklessly or knowingly, which although we haven't given a definition of that, I mean we're going to get to that point at some juncture."

We note that on appeal, the State belatedly understands this point and writes in its brief as follows: "[T]he only disputed issue [in this case] was whether defendant was aware that her conduct with her infant son created a strong probability of death or great bodily harm or whether her acts were merely reckless, making her guilty of involuntary manslaughter." That statement is exactly right and explains why the jury needed the guidance of paragraph 2 of IPI Criminal 4th No. 5.01B as it evaluated the evidence pertaining to defendant's mental state. Specifically, in addition to being instructed

that to find defendant guilty, the jury had to find that she "knew" that her acts created a strong probability of death or great bodily harm to Joseph, the jury needed to know that defendant "knew" what the result of her conduct would be if she was consciously aware "that such result [(namely, Joseph's death) was] practically certain to be caused" by her conduct. The trial court's failure to so instruct the jury was error, and under the particular facts of this case, plain error.

## 5. *Plain Error*

■ Generally, when a defendant fails to raise an issue in her post-trial motion, she forfeits the opportunity to raise that issue on appeal. *People v. Shields*, 143 Ill. 2d 435, 446, 575 N.E.2d 538, 543 (1991). However, this forfeiture rule is not absolute. Supreme Court Rule 451(c) (177 Ill. 2d R. 451(c)) sets forth a limited exception that allows the review of substantial defects in instructions if the interests of justice require. An erroneous jury instruction may be considered plain error only where evidence of guilt is closely balanced or when the error denied the defendant a fair trial. *Shields*, 143 Ill. 2d at 446, 575 N.E.2d at 543.

> "The tests for application of Rule 451(c)'s exception to the waiver rule are 'strict tests' that 'demonstrate that the exception to the waiver rule is limited and is applicable only to serious errors which severely threaten the fundamental fairness of the defendant's trial.' *People v. Roberts*, 75 Ill. 2d 1, 15[, 387 N.E.2d 331, 337-38] (1979). The function of jury instructions is to convey to the jurors the law that applies to the facts so they can reach a correct conclusion." *People v. Hopp*, 209 Ill. 2d 1, 8, 805 N.E.2d 1190, 1194 (2004).

Thus, an erroneous jury instruction rises to the level of plain error "only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hopp*, 209 Ill. 2d at 8, 805 N.E.2d at 1194.

■ Judged in accordance with this standard, we conclude that the trial court's error in not giving paragraph 2 of IPI Criminal 4th No. 5.01B constituted plain error. We so conclude because (1) the mental state with which defendant performed the acts resulting in Joseph's death was the *only* contested issue before the jury; (2) the evidence pertaining to her mental state was closely balanced; and (3) especially in light of the jury's request for clarification of the mental-state issue, the failure to correctly instruct the jury regarding the mental state of knowledge denied defendant a fair trial.

As this court wrote in *People v. Comage*, 303 Ill. App. 3d 269, 275, 709 N.E.2d 244, 248 (1999), "[i]n determining whether a response to the jury's inquiry would have helped, a significant factor is what that

response would have been." Here, this factor weighs heavily against the State, for we know not only what the response would have been (paragraph 2 of IPI Criminal 4th No. 5.01B, as defendant requested), but also how important this response was in this one-issue case.

If a properly instructed jury were to find this defendant guilty of first degree murder on this evidence, we could affirm that conviction. But this court has no confidence in the guilty verdict now before us because the jury that returned that verdict made clear it needed help with the mental-state instructions—help the trial court failed to provide.

## B. Other Issues

We decline to lengthen this opinion further by addressing substantively the other issues defendant raises on appeal except to say (1) the trial court's motion *in limine* rulings were correct and (2) the other issues are unlikely to arise on retrial.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

APPLETON, J., concurs.

JUSTICE McCULLOUGH, dissenting:

I respectfully disagree with the majority's determination that the trial court erred when it instructed the jury on the definition of knowledge.

I agree with the State that defendant has forfeited this issue by failing to include the same in her posttrial motion. Plain error applies; and on the merits, the trial court did not err in its instructions and response to the jury's question.

The failure of the trial court to give paragraph 2 of IPI Criminal 4th No. 5.01B does not rise to the level of plain error. The trial court's instructions given pursuant to IPI Criminal 4th Nos. 5.01, 5.01B, 7.02, and 7.08 adequately instructed the jury.

I dare to suggest that the instruction given required a stricter element of proof, "awareness of the substantial probability that such fact exists" (IPI Criminal 4th No. 5.01B(1)) as compared to "consciously aware that such result is practically certain to be caused by his conduct" (IPI Criminal 4th No. 5.01B(2)). The defendant is entitled to a fair trial, not a perfect trial.

The instructions as given by the trial court were appropriate, and the court's order should be affirmed.