*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. K. DIXON, Minor.

FOR PUBLICATION
June 15, 2023

No. 363388
Genesee Circuit Court
Family Division
LC No. 21-137495-NA

Before: GLEICHER, C.J., and O'BRIEN and MALDONADO, JJ.

MALDONADO, J. (*dissenting*).

## ON RECONSIDERATION

In this child protective case, respondent appeals by right from the trial court's order removing AKD from his care. I agree wholeheartedly with my colleagues' recitation of the tragic facts of this case, and I share their frustration with the conduct of the Department of Health and Human Services. Moreover, in light of the outcome ultimately reached by the majority, I concur with their instructions regarding the Department's role moving forward. However, my interpretation of the law governing these facts leads me to different conclusions. I would conditionally reverse the trial court's removal of AKD because DHHS failed to take reasonable efforts to prevent removal. I would order DHHS to promptly make reasonable efforts to prevent AKD's removal, and the trial court's removal would be reinstated only if AKD remains without proper care after such efforts are made. Because the majority has chosen instead to affirm, I respectfully dissent.

In this opinion I begin by narrowing the scope of this analysis and explaining why my focus is on the rules governing the court's authority to remove children from the care of their parents. Then, I provide background on the "one parent doctrine" in order to explain my position that the trial court had no right to leave AKD in foster care after respondent was declared the legal father but before a petition had been brought against him. Next, I explain my contention that the trial court's finding that reasonable efforts were made to prevent removal was clearly erroneous. Finally, while acknowledging the gaps in the law governing this field, I explain why I believe the proper remedy in a case such as this is conditional reversal of the removal order.

## I. BASIS FOR APPEAL

At the outset, I believe that the proper focal point of the analysis in this case is the trial court's order removing AKD from respondent's care because this is the order which provides the basis for this Court's jurisdiction.

Appellate jurisdiction in child protective proceedings is laid out by MCR 3.993, which provides in relevant part:

>       (A) The following orders are appealable to the Court of Appeals by right:
>
>       (1) any order removing a child from a parent's care and custody,
>
>       (2) an initial order of disposition following adjudication in a child protective proceeding,
>
> \* \* \*
>
>       (7) any final order.
>
> \* \* \*
>
>       (B) All orders not listed in subrule (A) are appealable to the Court of Appeals by leave.

For context, I will briefly discuss the process in a child protective proceeding, then identify where respondent was in this process when this appeal was commenced. Child protective proceedings are initiated when DHHS files a petition containing "a request for court action to protect a child . . ." MCR 3.961(A). The proceedings were initiated against respondent when DHHS filed a petition on May 25, 2022. When DHHS petitions the court to take jurisdiction in a child protection matter, "the trial court must hold a preliminary hearing and may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). "The preliminary hearing must commence no later than 24 hours after the child has been taken into protective custody . . . unless adjourned for good cause shown, or the child must be released." MCR 3.965(A)(1). This rule was flouted by the trial court as the preliminary hearing did not commence until September 20, 2022. At the preliminary hearing, the trial court decided to authorize the petition. If a petition is authorized, the court may order that the child be placed in foster care pending trial if it finds that the requirements of MCR 3.965(C)(2) are met. In this case, the trial court so found, and that is where the proceedings were at the time of the appeal. I believe it is important to clarify that respondent is appealing the removal of AKD and the authorization of the petition; the trial court had not yet exercised jurisdiction at the time of the order from which respondent appeals.

Respondent appeals from the September 29, 2022 order after following the preliminary hearing in which the court authorized the petition and ordered AKD's removal. Moreover, in his claim of appeal, respondent asserted that the order being appealed was an "order removing a child from a parent's care and custody." However, in his brief on appeal, respondent erroneously cites MCR 3.993(A)(2), which confers us with jurisdiction to hear appeals from an initial disposition following adjudication; respondent appealed prior not only to the initial disposition, but prior to

-2-

the court's assumption of jurisdiction. Therefore, I would treat this as an appeal by right pursuant to MCR 3.993(A)(1), which applies to appeals from any order removing a child. Moreover, while the focal point respondent's analysis was the court's decision to authorize the petition, AKD's removal was raised in his statement of the questions presented.

Because the trial court's order removing AKD formed the basis for our jurisdiction in this matter, I believe it necessary to address the validity of this order.

## II. *IN RE SANDERS* AND THE ONE PARENT DOCTRINE

In light of our Supreme Court's holding in *In re Sanders*, 495 Mich 394, 422; 852 NW2d 524 (2014) and its abolition of the one parent doctrine, I do not believe that the circuit court had any legal authority upon which to base its decision to leave AKD in foster care during the interim period between respondent-father being established as the legal father and the court ordering AKD's removal.

It is well established that parents have a fundamental constitutional right "to make decisions concerning the care, custody, and control of their children." *Troxel v Granville*, 530 US 57, 66; 120 S Ct 2054; 147 L Ed2d 49 (2000). Because of this right, "there is a presumption that fit parents act in the best interests of their children." *Id*. at 68. To respect this right and honor this presumption, our Supreme Court has held "that due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." *Sanders*, 495 Mich at 422. "[D]ue process requires that *every* parent receive an adjudication hearing before the state can interfere with his or her parental rights." *Id*. at 415.[1]

On February 22, 2022, respondent-father appeared in court for the first time as AKD's undisputed legal father.[2] Respondent-father did not waste this opportunity to direct placement of AKD with PM. However, the circuit court responded to this directive as follows:

> The concern is, Mr. Dixon, that I have is that mother's rights were terminated; *by mother's rights having been terminated, I still have the authority to direct placement of the child by that case.* The Department may or may not be filing a petition with respect to you; so for you to just randomly say I want the child here, I would disagree with your lawyer that I just have to say okay, because I have authority over the case, but we're not gonna get into that.

---

[1] The Supreme Court acknowledged that "extending the right to an adjudication to all parents before depriving them of the right to direct the care, custody, and control of their children will impose additional burdens on the DHS," but it concluded that "those burdens do not outweigh the risks associated with depriving a parent of that right without any determination that he or she is unfit . . . ." *Sanders*, 495 Mich at 418-419.

[2] I emphasize again that respondent-father had been definitively established as AKD's biological father as of the September 29, 2021 hearing, and both parents had signed an affidavit of parentage as of the November 23, 2021 hearing.

The circuit court's assertion that it had the authority to deprive respondent-father of his right to direct the care and custody of his child by virtue of its jurisdiction over respondent-mother is a clear application of the "one-parent doctrine" that our Supreme Court squarely rejected in *Sanders*. Contrary to the circuit court's beliefs, every parent, including respondent-father, has the right to "receive an adjudication hearing before the state can interfere with his or her parental rights." *Id*. at 415. Because respondent-father had not had an adjudication hearing, the court did not have the authority to interfere with respondent-father's parental rights, see *Id*., and respondent-father's parental rights include the constitutional right to direct the care and custody of his child, see *Troxel*, 530 US at 66. Therefore, the circuit court did not have the authority to interfere with respondent-father's right to entrust PM with AKD's care. Moreover, because there had been no judicial finding regarding respondent-father's fitness, the court was duty-bound to presume that respondent-father's decision to place AKD with PM was in AKD's best interests. *Id*. at 68. As was aptly noted by the majority, "it has long been the law that a parent may 'entrust the care of their children for extended periods of time to others' 'without court interference by the state as long as the child is adequately cared for.' *In re Weldon*, 397 Mich 225, 296; 244 NW2d 827 (1976) (opinion by Levin, J.) (quotation marks and citation omitted), overruled in part on other grounds as stated in *Bowie v Arder*, 441 Mich 23; 490 NW2d 568 (1992)." Because respondent-father directed placement of AKD with PM, the circuit court did not have a basis upon which to order AKD's removal.

The majority stated that "[f]ather's incarceration and absence at the child's birth put him in the unenviable position of being unable to directly place his child without DHHS input," and DHHS "determined that PM was not an appropriate placement for AKD." However, I disagree with the premise that DHHS had the right to determine whether PM was an appropriate placement for AKD absent a judicial determination regarding respondent-father's fitness. See *Troxel*, 530 US at 68; *Sanders*, 495 Mich at 422. The majority's first source of authority in support of this premise is MCR 3.965, which sets out the rules governing preliminary hearings. MCR 3.965(B) sets out the procedure that a court must follow when conducting a preliminary hearing, and Subrule (B)(8) provides that "[t]he court must advise a nonrespondent parent of his or her right to seek placement of his or her children in his or her home." I would not interpret this rule as being broader than listing one of the rights of which a nonrespondent parent must be advised during the preliminary hearing for a respondent parent. Specifically, I do not view this rule as restricting the right of a nonrespondent parent—which respondent-father was as of February 22, 2022—to place the child with somebody else whom the nonrespondent parent deems fit, particularly when the rule is read against the backdrop of the Supreme Court's pronouncements *In re Sanders*.

MCR 3.965(C) governs pretrial placement of the children of a respondent parent, and Subrule (C)(5) provides:

> If the child has been placed in a *relative's* home,
>
> (a) the court may order the Family Independence Agency to report the results of a criminal record check and central registry clearance of the residents of the home to the court before, or within 7 days after, the placement, and

(b) the court must order the Family Independence Agency to perform a home study with a copy to be submitted to the court not more than 30 days after the placement. [Emphasis added.]

In my view, Subrule (C)(5) is inapplicable because *respondent-father is a parent, not a relative*. Rule 3.965 sets out rules and procedure aimed at the implementation of MCL 712A.2, and MCL 712A.13a sets out definitions for terms that are used in MCL 712A.2. See MCL 712A.13a(1). "Relative" is defined by MCL 712A.13a(j), and the version of the statute that was in effect during the lower court proceedings provided:[3]

> "Relative" means an individual who is at least 18 years of age and related to the child by blood, marriage, or adoption, as grandparent, great-grandparent, great-great-grandparent, aunt or uncle, great-aunt or great-uncle, great-great-aunt or great-great-uncle, sibling, stepsibling, nephew or niece, first cousin or first cousin once removed, and the spouse of any of the above, even after the marriage has ended by death or divorce.

"Thus, a child's biological parent is not that child's 'relative' for purposes of the statute." *In re Mota*, 334 Mich App 300, 322; 964 NW2d 881 (2020). Given the close relationship between MCL 712A.2 and MCR 3.965, I would apply the definition of "relative" set forth in MCL 712A.13a to the court rule as well. Such an interpretation would be consistent with cases such as *Sanders*,

---

[3] MCL 712A.13a was amended effective October 7, 2022 by 2022 PA 200.

> "Relative" means an individual who is at least 18 years of age and is either of the following:

> (*i*) Related to the child within the fifth degree by blood, marriage, or adoption, including the spouse of an individual related to the child within the fifth degree, even after the marriage has ended by death or divorce, the parent who shares custody of a half-sibling, and the parent of a man whom the court has found probable cause to believe is the putative father if there is no man with legally established rights to the child.

> (*ii*) Not related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in the child's life or the child's parent's life if the child is an infant, as determined by the department or, if the child is an Indian child, as determined solely by the Indian child's tribe. As used in this section, "Indian child" and "Indian child's tribe" mean those terms as defined in section 3 of chapter *XIIB*.

There does not currently appear to be caselaw discussing whether biological parents remain excluded from the statutory definition of "relative." However, because the prior version was in effect at all relevant times in this case, resolution of that question is immaterial for the purposes of this appeal.

*Troxel*, and *Weldon* that recognize the special right of parents to direct the care and custody of their children.

Finally, the majority cites *Mathews v Eldridge*, 424 US 319; 96 S Ct 893; 47 L Ed2d 18 (1976). Through its detailed application of what has come to be known as the "*Eldridge* factors," the majority persuasively argued that the trial court had a strong interest in protecting AKD from the "substantial risk of emotional harm" that would accompany "an abrupt removal of AKD from his foster care placement" that would exist "even if the proposed placement were ultimately determined to be fit." However, having a strong interest in taking an action is not the same as having the authority to take such action. Moreover, I worry that recognizing in trial courts what would essentially be an equitable power to block unadjudicated, legal parents from placing their children in order to prevent the emotional trauma of upheaval could prevent respondent from ever taking custody of AKD. The goal in this case remains reunification, and as more time elapses with AKD in foster care, the trauma he would endure from being returned to his father will likely increase. I do not want trial courts to believe that a child's bond with his foster family and his interest in permanence empowers the court to bar reunification with a parent who has removed all other barriers to reunification.

For these reasons, I would conclude that the trial court lacked the authority to leave AKD in foster care over the objections of his unadjudicated, legal father.

III. REASONABLE EFFORTS

Because a court cannot order the removal of a child from the child's parent absent a finding that reasonable efforts to prevent removal were made and because I believe the trial court clearly erred by finding that such efforts were made in this case, I would reverse the trial court's decision to remove AKD from respondent-father's care.

MCR 3.965(C)(2) provides:[4]
> The court may order placement of the child into foster care if the court finds all of the following:
>
> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.
>
> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk as described in subrule (a).
>
> (c) Continuing the child's residence in the home is contrary to the child's welfare.

---

[4] While the revised majority opinion issued on reconsideration clarifies that the removal order forms the basis of this appeal, it nonetheless does not contain any references to MCR 3.965(C)(2) nor does it engage in any discussion of reasonable efforts.

(d) Consistent with the circumstances, *reasonable efforts were made to prevent or eliminate the need for removal of the child*.

(e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare. [Emphasis added.]

See also MCL 712A.13a(9).

In this case, the lead opinion does an excellent job detailing the departments failures with respect to its duties to respondent-father:

Prior CPS investigations do not automatically preclude consideration of a relative caregiver, and PM likely now falls within that category. The DHHS stated that PM had "nine instances of CPS history" between 2004 and 2018. The DHHS did not differentiate between "investigations due to affiliation with" other subjects and those "regarding herself." The DHHS did not indicate whether those reports were substantiated. It did not describe whether services were provided and if so, of what type and whether PM benefitted. Moreover, the DHHS failed to consider PM's years of sobriety since these investigations. While the DHHS expressed concern that AKD's biological mother could pose a safety threat in this placement, it failed to recognize that a safety plan could be formulated to protect the child.

Second, the lack of parent-child contact in this case violates the Juvenile Code. MCL 712A.13a(13) and MCL 712A.18f(3)(c) require the court to permit "regular and frequent parenting time" when a child is removed from a parent's care. The court recognized this duty and ordered the DHHS to arrange video visits for the incarcerated father and his young son. As of December 2022, those visits still were not occurring, contrary to court order. . . .

Third, it appears from the record that little has been [done] to secure services for father even after he was named as a respondent. Father reported that he had completed a substance abuse program and a caseworker vaguely described material she had provided about children and trauma. At the very least, the caseworker must provide available workbooks for father to complete, as has been done in many other cases involving incarcerated parents. MCL 712A.19a(2) excuses the DHHS from making reasonable efforts toward reunification only under very limited aggravated circumstances. The mere fact of imprisonment is not one of them. And the *DHHS's efforts have been grossly inadequate thus far*. . . . [Emphasis added; citations omitted.]

In my opinion, it was a clear error for the circuit court to find under these facts that reasonable efforts to prevent removal were made.

The violations of *In re Sanders* that were outlined above bolster my conclusion that reasonable efforts were not made. The rule requires a finding that "reasonable efforts *were made*," so it is not specified who must make the reasonable efforts. This is where the above discussion of the one parent doctrine becomes critical; the court's failure to allow respondent to place AKD ran afoul of the mandate that reasonable efforts be made to prevent removal. Indeed, it is highly likely

-7-

that the court's violation of respondent's right to direct the care and custody of his child is the reason why it later decided that removal was necessary. The trial court's unauthorized refusal to allow AKD to place his child likewise informs my conclusion that reasonable efforts to prevent removal were not made. In other words, reasonable efforts were made neither by DHHS nor the court.

For these reasons, I would conclude that the trial court clearly erred by finding that reasonable efforts were made to prevent removal.

## IV. REMEDY

I believe that the proper remedy for the trial court's erroneous removal of AKD is a conditional reversal.

Having established that the trial court erred by ordering AKD's removal, the next issue is the proper remedy for this error. The majority accurately notes "that the law regarding this issue is difficult to parse and that no clear guidelines exist to assist courts confronted with similar situations." This situation is particularly nuanced; in general, if a child does not have a safe home because reasonable efforts to prevent removal were not made, this does not change the fact that the child does not have a safe home. Did the Legislature intend for a child in this situation to simply be returned to an unsafe environment? To frame the issue in a manner particularized to the case before us, the courts have been left to determine what to do when a child has been wrongly left in foster care for an extended period of time in violation of the constitutional rights of a parent—a parent who has likewise been wrongfully deprived of a meaningful opportunity to form a bond with the child. Until we have further guidance from the Supreme Court or the legislature, I have found counsel from our Supreme Court's opinion in *In re Morris*, 491 Mich 81; 815 NE2d 62 (2012).

In *Morris*, our Supreme Court examined the notice provisions of the federal Indian Child Welfare Act (ICWA), 25 USC 1901 through 1963. *Id*. at 88. ICWA requires "that notice of certain involuntary child custody proceedings be sent to the appropriate Indian tribe or to the Secretary of the Interior where the court knows or has reason to know that an Indian child is involved." *Id*. (quotation marks and citation omitted). After determining that the ICWA notice provisions had been violated, the Court had to determine the proper remedy because no such remedy was provided by the statute. *Id*. at 114-115.[5] The Court contemplated three possible remedies: automatic reversal, conditional reversal, and conditional affirmance. *Id*. at 115. In cases such as the one currently before us, we are faced with an analogous conundrum: there were serious and unacceptable violations of the law perpetrated early in the case, but the relevant law provides no remedy for situations in which it is violated.

In *Morris*, the Court noted that argument in favor of the first remedy—automatic reversal—was that the finding of a notice violation would divest the court of its "jurisdiction to enter any

---

[5] "Having determined that the notice requirement of 25 U.S.C.A. § 1912(a) was triggered in both cases before us and that the trial courts did not fully comply with that statute, we are left to consider the proper remedy for ICWA-notice violations." *Morris*, 491 Mich at 114.

foster care or termination of parental rights orders pending resolution of the tribal-notice issue." *Id*. at 116. In this case, the automatic-reversal argument mirrors that made in *Morris*: the trial court had no legal authority to bar respondent from placing the child, so that and all subsequent actions should be nullified. In *Morris*, based in part on an analysis of other provisions of ICWA, the Court determined that violation of the notice provision would not require the "immediate return of the children to the home from which they were removed." *Id*. at 117.

However, importantly for our purposes, this conclusion was not based entirely on its interpretation of ICWA's other provisions:

> We also do not believe that automatic reversal would be in the best interests of the children. In the majority of cases involving ICWA-notice violations that were conditionally affirmed by the Michigan Court of Appeals, it was eventually determined that the children were not Indian children and thus that ICWA did not apply. An automatic-reversal rule would require new termination proceedings in even the cases not involving Indian children, and this would disrupt or delay the permanent placement of the child. It would be counterproductive and nonsensical to disrupt the permanent placement of a child before it is determined whether the child is an Indian child. Additionally, an automatic-reversal rule would not conserve judicial resources because it would require the invalidation of all orders entered when there was an ICWA-notice violation, even if it is later determined that the child is not an Indian child. [*Id*. at 119-120.]

Furthermore, the Court noted that "the automatic-reversal remedy would be inconsistent with our longstanding disfavor of automatic reversals." *Id*. at 120.

In this case and those like it, the above rationales against automatic reversal are equally applicable. It cannot be argued in good faith that automatic reversal would be in the best interests of AKD. This remedy would "disrupt or delay the permanent placement of" of AKD, and "[i]t would be counterproductive and nonsensical" to remove AKD from the foster family with whom he has established a home and a strong bond in order to place him with a stranger despite being aware of the possibility that AKD could ultimately be returned to foster care. *Id*. at 119-120. Moreover, it is equally true in this case that automatic-reversal "would be inconsistent with our longstanding disfavor of automatic reversals." *Id*. at 120 (citing *In re Osborne*, 459 Mich 360, 369; 589 NW2d 763 (1999) ("Rules of automatic reversal are disfavored . . .").).

In *Morris*, after establishing that automatic-reversal was not an appropriate remedy, the Court determined that conditional-reversal was favorable to conditional-affirmance. *Id*. at 120-121. While recognizing that there were little practical differences between the two, the Court emphasized the difference in the message conveyed:

> [B]etween the two remedies, conditional reversal is more deferential to tribal interests, as expressed by ICWA, and is more likely to ensure these interests are protected by the trial courts. The term "conditional reversal" sends a clearer signal to the lower courts and the DHS that they must pay closer attention when ICWA is implicated. In sum, we think that the conditional-reversal remedy is more

emphatic, more consistent with the text and purposes animating ICWA, and more likely to encourage compliance with ICWA. [*Id.* at 121.]

This is not an ICWA case, but similar interests are at play. In this case, respondent has immeasurable interests in the protection of his relationship with his son, and a conditional reversal is both "more deferential to" these interests "and is more likely to ensure these interests are protected by the trial courts." *Id.* Moreover, as was thoroughly detailed by the majority, DHHS spent more than a year flouting respondent's constitutional rights. A conditional reversal would send an emphatic message to the Department and the trial court that such conduct will not be tolerated while also protecting the best interests of AKD.

The majority says that it does "not condone the court's and DHHS's treatment of father or the violation of his constitutional rights." I have the utmost respect for my colleagues and do not doubt the truth of this statement nor their disappointment in the conduct of DHHS. However, as a practical matter, I worry that the majority's decision to affirm, reluctant as it may be, sends a different message. I believe it is neither the intent of the Legislature nor in the best interests of the affected children to implicitly send a message to DHHS that it can violate the constitutional rights of a parent without any practical consequences. I believe that a conditional reversal would send the appropriate message.

Finally, in *Morris*, the Supreme Court outlined what the trial court was required to do in response to the conditional reversal:

On remand, the trial courts shall first ensure that notice is properly made to the appropriate entities. If the trial courts conclusively determine that ICWA does not apply to the involuntary child custody proceedings—because the children are not Indian children or because the properly noticed tribes do not respond within the allotted time—the trial courts' respective orders terminating parental rights are reinstated. If, however, the trial courts conclude that ICWA does apply to the child custody proceedings, the trial courts' orders terminating parental rights must be vacated and all proceedings must begin anew in accord with the procedural and substantive requirements of ICWA.

A similar approach should be taken in this case. I would remand this case to the trial court with orders to make reasonable efforts to prevent the continuation of AKD's stay in foster care. In this regard, there is some overlap with the majority's decision. I would order that DHHS conduct a new home study with PM and that DHHS must presume that PM is a fit placement unless articulable reasons to the contrary are established. General allegations that PM has had proximity to CPS investigations will not suffice. If concerns are raised with PM, these should not prevent placement with her unless the concerns rise to such a level that removal would be warranted had AKD been placed with her upon respondent's first request. Under this approach, the removal order would not be reinstated unless DHHS provides the court with both detailed allegations against PM as well as specific reasons why there is no assistance DHHS can offer PM to overcome these barriers.

For these reasons, I would remedy this case with a conditional reversal of the order removing AKD.

CONCLUSION

In conclusion, for the reasons detailed in this opinion, I would conditionally reverse. Finally, I would like to note that I cannot vouch for respondent-father's ability to succeed as a parent in the same way that I cannot prospectively vouch for the ability of any parent to succeed. However, future uncertainty does not justify the state in preemptively violating the constitutional right of parents to raise their children and, more importantly, the constitutional right of children to be raised by their parents. The possibility of failure does not justify the deprivation of the opportunity for success. As former Chief Justice Bridget McCormack aptly put when dissenting in a termination case, "[i]f incarceration alone is insufficient to justify" state interference with the parent-child relationship, "it isn't clear to me there is much more this respondent could have done to provide proper care and custody for [the child] under the circumstances." *In re Whisman*, 506 Mich 931; 949 NW2d 153 (2020) (McCORMACK, C.J., dissenting).

Respectfully, I dissent.

/s/ Allie Greenleaf Maldonado