# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Perry*, 2011 IL App (1st) 081228

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO PERRY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-08-1228 |
| Filed | March 31, 2011 |
| Rehearing denied | February 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was upheld over his contentions that the trial court erred in refusing to give an instruction on involuntary manslaughter, refusing to give the second paragraph of the instruction on the definition of knowledge, failing to comply with Supreme Court Rule 431(b), since defendant and several boys attacked the victim, defendant continued beating the defenseless victim as he lay on the ground and the intensity of the beating established that defendant did not merely "consciously disregard" risk that he would likely cause death or great bodily harm, any error arising from the failure to give the second paragraph of the instruction on knowledge was harmless under the circumstances, defendant forfeited his claim that the trial court violated Rule 431(b). |
| Decision Under Review | Appeal from the Circuit Court of Cook County, 06-CR-11309; the Hon. James M. Schreier, Judge, presiding. |
| Judgment | Affirmed as modified and remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Patricia Unsinn, and Emily S. Wood, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Gallagher and Justice Lavin concurred in the judgment and opinion.

## OPINION

¶ 1      Following a jury trial, defendant, Antonio Perry, was convicted of first degree murder and sentenced to 22 years in prison. In this appeal, defendant asserts the trial court committed reversible error in the following: (1) refusing to instruct the jury on the lesser-included offense of involuntary manslaughter; (2) refusing to give the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.01B) on the definition of knowledge; (3) failing to question the venire in accordance with *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1064 (1984); (4) allowing the introduction of more than one prior inconsistent statement for several witnesses who recanted their prior statements at trial; and (5) allowing credit for time served only from the date he was imprisoned in Illinois, and not from the date of his arrest and incarceration in Minnesota.

¶ 2      We determine that: (1) defendant was not entitled to a jury instruction for involuntary manslaughter where the evidence showed the intent to kill or do great bodily harm, or knowledge that the acts committed create a strong probability of such result, and not merely reckless conduct which is likely to cause death or great bodily harm; (2) there was no reversible error in the trial court's refusal to instruct the jury based on IPI Criminal 4th No. 5.01B where any error would have been harmless under the one-good-count presumption that arises under a general verdict, there was no specific jury request regarding mental states, and the trial court gave the appropriate instructions which correctly stated the law for each method of murder; (3) defendant forfeited review of his claim that the trial court did not comply with *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1064 (1984), and Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), and did not establish plain error because, although the court violated Rule 431(b), the evidence was not closely balanced and the violation of Rule 431(b) was not a structural error that affected the fairness of the trial; (4) defendant forfeited review of whether the introduction of several prior inconsistent statements of witnesses was error, and there was no plain error because the statements were properly admitted as prior

inconsistent statements; and (5) defendant is entitled to credit for time served from the date of his arrest in Minnesota, excluding the date of sentencing. Therefore, we affirm defendant's conviction and sentence, but order that the mittimus be corrected to reflect 819 days served by defendant prior to sentencing.

¶ 3                                    BACKGROUND

¶ 4        The following facts were adduced at defendant's jury trial. The State presented the testimony of several eyewitnesses: Andre Edwards; Charles Bills; Sheila Bills; Jasmine Cummings; Jamal Hayes; Harry Hardy; and Deandre Boozer.

¶ 5        Andre Edwards is the victim Dewone McClendon's cousin, and he was with Dewone on June 21, 2005, the date of Dewone's murder. Andre testified that they were at a party at 105th and Indiana for Dewone's birthday. Sometime after 8:30 p.m., they left the party to get chicken at a store and meet some girls. Dewone was carrying a bottle of vodka. Both Andre and Dewone had been drinking. They encountered defendant and a group of eight or nine boys on 104th Street between Michigan and Indiana. The group of boys said "GDK," meaning "Gangster Disciple Killer," which is said by gangs who are rivals of the Gangster Disciples, "all is well" and "BPSN," which means "Black P Stone Nation." Andre and Dewone said that they were not gang bangers, that they were just "trying to chill" because it was Dewone's birthday, and that they were getting ready to walk away. The boys followed them and they all argued. Defendant then punched Dewone in the jaw, and someone else punched Andre. Andre tried to break away, but four or five boys followed him and kicked and hit him after he fell onto the street. He did not see what happened to Dewone. When the boys ran, Andre got up and started walking toward 103rd to the chicken place. En route, he encountered his mother and told her what happened, and she walked over to Dewone.

¶ 6        Andre went to the police station in the early morning hours of June 22, 2005, and returned to the station several times thereafter. On March 20, 2006, Andre identified defendant from a photo array as the person who punched Dewone. On April 20, 2006, Andre also identified defendant in a lineup as the person who punched Dewone.

¶ 7        Charles Bills and Sheila Bills were sitting on their porch at 10356 South Indiana the evening of June 21, 2005, with their upstairs neighbor Joyce Sutter and their friend Jasmine Cummings. Charles Bills testified that just after 8:30 p.m., he saw a bigger group of boys chasing a small group of boys down the street. The big group of boys caught one of the boys from the small group in front of Charles's house. A boy from the big group punched a boy from the small group in the head, and he fell to the street and did not move. The big group of boys began kicking and stomping the boy on the ground on his head and torso. Someone from the big group threw a bottle at the boy on the ground. Charles called to his son to call the police. When the sirens were heard, the big group of boys ran while the boy on the ground remained motionless.

¶ 8        Sheila Bills testified that she observed a group of young men who were arguing stop in front of her house. One boy from the group removed his shirt, grabbed the boy who died and hit him with his fist. The boy fell to the ground, and when he tried to run, he was hit again. The boy again fell and this time did not move. A couple of the boys, including the one who

punched him, were stomping on the boy on the ground with their feet. The boy on the ground was not moving. The big group of boys continued to stomp on the boy who died until they could hear the sirens. Then the boys in the big group ran. There was another boy also on the ground who broke free and ran. Some boys attempted to pursue him. That boy brought his mother to the boy who was on the ground.

¶ 9 Jasmine Cummings testified that she and her 11-year-old daughter were visiting Charles and Sheila Bills at 10356 South Indiana, sitting on their porch. She saw two boys being followed by a group of eight to nine boys. Two boys, one from each group, were arguing. One boy took his shirt off and punched one of the two boys, who fell to the ground. The boy tried to get up but was pulled back down. The big group of boys, including the boy who threw the punch, moved in on the boy on the ground and started to kick him all over. The major focus of the kicking, however, was the boy's head. The boy on the ground was not moving or fighting back. The other boy from the group of two ran. Some of the boys from the big group at first started to chase him but then returned and continued kicking the boy on the ground. Someone from the group picked up a bottle and cracked it over the boy's head, using the bottle like a club. Jasmine and the Bills yelled at the boys to stop but could not intervene because there were too many boys. The boys continued kicking the boy on the ground until they heard the sirens.

¶ 10 Jamal Hayes testified that he was in his car near 104th and Indiana listening to music. He observed a group of people in front of Joyce Sutter's house at 10356 South Indiana arguing, including Dewone and Dewone's cousin. Hayes did not know the person arguing with Dewone. Hayes testified there was a large fight and that he saw Dewone fall to the ground but did not know what happened to cause Dewone to fall, but Dewone did not move again. After Dewone fell to the ground, several people were kicking and punching Dewone but Hayes could not see who they were. Someone also hit Dewone with a bottle. It could have been the same person who hit Dewone. Hayes exited his car and ran to the corner, shouting, "Enough." Just then, he heard sirens and the boys ran. The police and Dewone's aunt arrived on the scene. Dewone's condition was very bad. Hayes asked someone to turn Dewone over because he was afraid Dewone was choking on his own blood. Hayes later met with the police and a prosecutor and gave a signed statement, and he also testified before the grand jury that one person punched Dewone in the face, kicked and punched Dewone on the ground, and hit him with the bottle.

¶ 11 Harry Hardy testified that he was at 104th and Indiana playing basketball when he saw Dewone and another person walking down Indiana. He testified that he did not see or remember much of the incident. Dewone encountered defendant and was yelling something but Hardy did not know what he was saying. Hardy saw defendant punch Dewone, did not see anyone else hit him, and did not see the fight. Hardy testified he did not see anything happen to Dewone. Hardy admitted he gave a signed, written statement to police and a prosecutor, but denied making the statements contained therein. Assistant State's Attorney Kim Ward testified that she spoke with Hardy and took his statement at the police station. She wrote a summary of his account, and when she finished, Hardy reviewed it, made some changes, and signed it. Ward then published portions of the statement to the jury.

¶ 12 According to Hardy's statement, Dewone told defendant he was going to turn his back

on defendant and put his bottle down. Defendant then took his shirt off and punched Dewone in the face. Dewone did not put his hands up and did not threaten defendant. Dewone fell after defendant hit him and defendant kicked him. No one else hit Dewone. Dewone did not fight back and was not moving. Defendant picked up the bottle. Hardy claimed the statement was written outside his presence and, while he was allowed to make some changes, he was not allowed to "do everything he wanted" with the statement. Hardy also denied making these same statements under oath before the grand jury. However, Assistant State's Attorney Thomas Simpson testified that on November 8, 2005, he met with and presented Harry Hardy as a witness before the grand jury. Hardy was with his father. Hardy answered questions under oath about the incident. Hardy acknowledged that the statement he gave to Assistant State's Attorney Ward was true. It was stipulated that the court reporter from the grand jury proceedings would testify that Hardy gave those answers to questions before the grand jury.

¶ 13    Defendant and the State stipulated that if Early Key, an investigator, were called to testify, he would state that he was present when defense attorneys interviewed Hardy on January 24, 2008, and that Hardy told the attorneys that he heard Dewone and Andre arguing with the other group and that Dewone yelled, "BPSK" and "Y'all some bitch ass niggers" during the argument.

¶ 14    DeAndre Boozer testified that he was playing basketball near 104th and Indiana when defendant and a group of ten or more boys asked to play. Boozer told them they would have to wait until he finished his game. Boozer continued playing basketball and saw Dewone and his cousin Andre walking. The same group of boys began arguing with Dewone on the corner down the street. Boozer heard "GDK" and "BPSK." He also heard Dewone say that it was his birthday and that he would turn his back on them and tried turning around from the group. Boozer then saw the group of boys rush in and fight. Boozer could not tell if someone grabbed Dewone and punched him, but he knew that Dewone had been hit because Dewone was on the ground. Boozer did not see Dewone threaten or swing at anyone. While Dewone was on the ground, the group was still punching and kicking Dewone. Dewone was still moving at that time. Defendant was one of the people who punched Dewone. Boozer saw the bottle of liquor Dewone had been holding fly into the air. Dewone's cousin ran. Boozer walked toward the fight but the fight stopped. Boozer testified he could not see all of the fight because people who were out on the street also gathered around the fight.

¶ 15    On November 1, 2005, Boozer identified defendant from a photo array at the police station. He gave a written statement and identified photographs, all of which he signed. Boozer identified a photo of defendant as the person who asked to play basketball with him and then yelled "GDK" and argued with Dewone. In his statement, Boozer said that Dewone said he was going to turn his back on the group and he and his cousin turned and started to walk away but defendant caught up to them. Defendant took his shirt off. Dewone tried to run but defendant grabbed him and punched him in the face. Dewone's head jerked back and Dewone hit the concrete. Dewone had not swung at or threatened defendant or anyone in his group. While Dewone was on the ground, defendant punched Dewone, stomped on Dewone's face, and then took the bottle Dewone had been holding and hit Dewone twice in the head with it, causing it to break. The fight ended when they heard the sirens. Boozer also testified to these facts before the grand jury and testified that he identified defendant in a

lineup as the person who hit Dewone in the face.

¶ 16    However, at trial Boozer denied telling police that defendant hit Dewone. He testified that when he made the statement, he had been taken to the police station by two detectives who told him that someone placed him at the scene. He was afraid and thought he would get into trouble. He felt he had to provide certain answers to the prosecutor, and based on his conversation with the detectives he knew the answers the prosecutor was seeking. Therefore, Boozer told the prosecutor things he did not actually see that he "got from everyone else's story," such as defendant punching Dewone before Dewone went down. He also testified that he lied to the grand jury because he thought that was what they wanted to hear. The same two detectives escorted him to the grand jury and he was scared. Boozer testified that his grand jury testimony was not wholly truthful because he did not actually see certain events.

¶ 17    Chicago police detective Brian Forberg was assigned to investigate the beating of Dewone around 9:30 p.m. the evening of June 21, 2005. At first, Detective Forberg proceeded to Christ Hospital, where Dewone was transported by the ambulance. However, on the way to the hospital Forberg learned that Dewone had died from his injuries. Detective Forberg then went to the scene of the incident, 10356 Indiana, to investigate. Forberg testified that he interviewed Charles and Sheila Bills, Joyce Sutter, and Andre Edwards. Forberg began looking for defendant but was unable to locate him. On November 2, 2005, Officer Forberg obtained an arrest warrant for defendant. On December 28, 2005, Forberg learned that defendant was in custody in St. Paul, Minnesota. Defendant was arrested on the warrant and Forberg brought defendant back to Chicago in April and conducted lineups. Edwards and Boozer both identified defendant.

¶ 18    Chicago police officer John Kaput, a forensic investigator, was assigned to the homicide investigation. Kaput spoke to police officers, photographed and videotaped the scene and marked evidence to be taken for processing. Kaput identified the bottle recovered from the scene, which was in two pieces. Sheila Daugherty of the Illinois State Police, a forensic specialist in latent fingerprints, testified that she examined the bottle for latent fingerprints but did not find any that were suitable for comparison. The prints could have been wiped off or washed off by any liquid.

¶ 19    Dr. Kendall Crowns was the deputy Cook County medical examiner who performed the autopsy on Dewone on June 22, 2005. He testified that his external examination revealed a broken nose and numerous abrasions and bruises to the left side of his face, an abrasion to the left ear and earlobe, bruising on the inner surface of his upper and lower lips, bruising and swelling on the right side of his head by his ear and an abrasion by his eye. Dr. Crowns testified that these injuries were consistent with blunt force trauma caused by an object without a sharp edge, such as a fist, foot, or smooth bottle. There were also two bruises on the back of Dewone's left arm, which were consistent with blunt force trauma or being grabbed.

¶ 20    Dr. Crown's internal examination revealed that Dewone suffered a subgaleal hemorrhage in the mid parietal region of his brain, the cause of which would be a blunt force trauma. Dewone also had a diffuse subarachnoid hemorrhage all over his brain, which was a little more prominent at the back and base of the brain. Such a hemorrhage irritates the brain and

results in swelling, which then compromises the brain stem and in turn compromises a person's respiratory and heart rate, resulting in death. Someone with a subarachnoid hemorrhage would lose consciousness and die within a matter of minutes. One would have to receive a very hard blow to the head to result in a subarachnoid hemorrhage, an extremely hard hit which jolts the head like that in a boxing match. In total, there were 17 individual injuries, all by blunt force trauma in the form of "very, very hard blow or very hard strikes to the head." Dewone could have suffered more strikes and blows which did not leave any marks. Dr. Crown did not observe any defensive wounds on Dewone, when an individual is trying to block whatever is hitting him, usually along the forearms and the back of the hands. Dewone's blood alcohol level was 0.23. The legal limit for intoxication is 0.08. Dewone's intoxication level would have made him less coordinated. Dr. Crown concluded that Dewone's injuries were consistent with being kicked, stomped, and punched about the head. The cause of death was ruled cerebral injuries due to an assault, and the manner of death was homicide.

¶ 21　　An arrest warrant for defendant for first degree murder was issued on November 2, 2005. On May 16, 2006, defendant was indicted for two counts of first degree murder and one count of aggravated battery. At trial, the court gave the jury definitional and issues instructions for first degree murder. The court also gave the first paragraph of IPI Criminal 4th No. 5.01B, defining knowledge, but refused defendant's request to also give the second paragraph. The trial court also refused defendant's request to give the jury an instruction for involuntary manslaughter. The court found that the facts adduced at trial did not support giving the instruction. At 4:47 p.m., the jurors sent a note with the following question to the trial court: "Can we consider another charge like 2nd degree murder?" The court sent the written response, "No."

¶ 22　　The jury convicted defendant of first degree murder under a general verdict. Defendant's motions for a new trial were denied. The trial court sentenced defendant to 22 years in prison and gave 706 days credit. Defendant requested credit from the date of his arrest in Minnesota, but the trial court found that the statute calls for credit only for days in custody when he returned to Illinois.

¶ 23　　　　　　　　　　　　　　ANALYSIS

¶ 24　　Defendant argues that the trial court erred in the following: (1) refusing to instruct the jury on the lesser-included offense of involuntary manslaughter; (2) refusing to give the second paragraph of IPI Criminal 4th No. 5.01B on the definition of knowledge; (3) failing to question the venire in accordance with *Zehr* and Supreme Court Rule 431(b); (4) allowing the introduction of more than one prior inconsistent statement for several witnesses who recanted their prior statements at trial; and (5) allowing credit for time served only from the date he was imprisoned in Illinois, and not from the date of his arrest and incarceration in Minnesota. We address each argument in turn.

¶ 25　　　　　I. Instruction on Lesser-Included Offense of Involuntary Manslaughter

¶ 26　　We begin with defendant's contention that the trial court committed reversible error

when it refused to instruct the jury on the lesser-included offense of involuntary manslaughter. Defendant argues that the evidence presented at trial supported an inference that he only recklessly caused Dewone McClendon's death.

¶ 27    Initially, defendant and the State disagree as to our standard of review. The State maintains that the giving of jury instructions is reviewed for an abuse of discretion, citing to *People v. Jones*, 219 Ill. 2d 1 (2006), and *People v. Castillo*, 188 Ill. 2d 536 (1999). Defendant maintains that whether the evidence warranted an instruction on a lesser offense is a question of law and is reviewed *de novo*, citing *People v. Everette*, 141 Ill. 2d 147 (1990). However, *Everette* addressed a self-defense instruction, not an instruction on a lesser-included offense, and does not espouse a *de novo* standard of review. The appropriate standard of review in determining whether a trial court's decision whether to give an instruction on a lesser-included offense is abuse of discretion. *People v. Cardamone*, 381 Ill. App. 3d 462, 507-08 (2008) (citing *People v. Garcia*, 188 Ill. 2d 265, 283 (1999)).

¶ 28    A "lesser-included offense" is an offense proven by lesser facts or a lesser mental state, or both, than the charged offense. *People v. Davis*, 213 Ill. 2d 459, 477 (2004). "Simply identifying the existence of a lesser-included offense does not necessarily create an automatic right to an instruction on that offense." *People v. Greer*, 336 Ill. App. 3d 965, 978 (2003) (citing People v. Novak, 163 Ill. 2d 93, 108 (1994)). Whether an instruction on a lesser-included offense is warranted depends on the facts and circumstances of each case. *People v. Grimes*, 386 Ill. App. 3d 448, 451 (2008). An instruction on the lesser-included offense of involuntary manslaughter is justified when there is some credible evidence to support the giving of the instruction. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). However, "[a]n instruction on a lesser-included offense is not required where the evidence rationally precludes such an instruction. [Citations.]" *Greer*, 336 Ill. App. 3d at 976. A manslaughter instruction should not be given where the evidence shows that the homicide was murder, not manslaughter. *People v. Sipp*, 378 Ill. App. 3d 157, 163 (2008).

¶ 29    Here, the evidence supported instructions for first degree murder, not involuntary manslaughter. A defendant commits first degree murder when he kills an individual without lawful justification and, when he performed the acts which resulted in the death, he intended to kill or do great bodily harm to the person, or he knows that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2004). A defendant commits involuntary manslaughter when he unintentionally kills by performing acts that are likely to cause death or great bodily harm to another and he performs those acts recklessly. 720 ILCS 5/9-3(a) (West 2004). A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2004). Murder and the included offense of involuntary manslaughter are thus distinguished only in terms of the mental state required; murder requires the intent to kill or do great bodily harm, or knowledge that the acts committed create a strong probability of such result, while involuntary manslaughter requires only reckless conduct which is likely to cause death or great bodily harm. *People v. Basden*, 264 Ill. App. 3d 530, 542 (1994), *appeal denied*, 158 Ill. 2d 554 (1994).

¶ 30 Although not dispositive, certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate. These include: (1) the disparity in size and strength between the defendant and the victim; (2) the brutality and duration of the beating, and the severity of the victim's injuries; and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife. In addition, an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly. *DiVincenzo*, 183 Ill. 2d at 250-51.

¶ 31 During the discussion of the involuntary manslaughter instruction at the jury instruction conference, the trial court discussed the factors outlined in *DiVincenzo* and concluded that the facts of this case simply did not warrant an involuntary manslaughter instruction:

"In this case we have a defenseless victim by all accounts. We have, through principles of accountability, if not a direct eyewitness attribution of the bottle and the striking of the victim with the bottle, a weapon used by the defendant, either by direct eyewitness testimony or under principles of accountability.

We have, most importantly, a gang of eight or nine gang members, one of whom is the defendant, who surround and aggressively attack the victim. The disparity between the sides is not even close.

We also have not some mutual fight or combat, but the victim turning his back and making no gesture whatsoever to engage or–in a fight, or to possibly bring about a mutual combat situation as opposed to *DiVincenzo* where the victim clenched his right fist and indicated in a posture-type situation that he was ready to fight.

You have multiple wounds lasting more than a moment or two, as opposed to *DiVincenzo*. And in *DiVincenzo*, in the light most favorable to the defense, you have no weapons involved, a very short duration, two men of equal size, an argument of swearing back and forth between the victim and the defendant for sometime–I think they might have even mentioned for about five minutes, and you have, according to the defendant's testimony, again, could a reasonable jury find that the defendant, *DiVincenzo*, said he punched the victim once and knee'd him in the side.

Really, a factual situation, which is not really close at all to this situation, which involves 17 separate abrasions or fractures–fracture to the nose area, 5 to 11 *** [p]oints of blunt trauma."

¶ 32 We concur with the court's reasoning. The facts of the instant case are unlike the facts in *DiVincenzo*, *People v. Taylor*, 212 Ill. App. 3d 351 (1991), and *People v. Tainter*, 304 Ill. App. 3d 847 (1999), cited by defendant. In *DiVincenzo*, the defendant and the victim fought one-on-one and were of the same general size and strength, there were only two blows, no weapon was used, the fight was over in a matter of seconds, and the resulting injury was a rare phenomenon. *DiVincenzo*, 183 Ill. 2d at 251. In *Taylor*, both the defendant and the victim were intoxicated, the defendant punched the victim one time, causing him to fall to the ground, then hit and slapped him to attempt to revive him, picked him up to place him in his car but dropped him again and his head hit the concrete. *Taylor*, 212 Ill. App. 3d at 356. Thus, there was no evidence of intent to kill or cause great bodily harm. In *Tainter*, the

defendant alone punched and kicked the victim, causing bruises and a broken jaw that did not appear immediately life-threatening, there was testimony that the beating was the result of a jealous rage, the parties had both been drinking, and the victim had an unusual cause of death. *Tainter*, 304 Ill. App. 3d at 850-51.

¶ 33 In great contrast in this case, defendant was not drunk or acting alone, nor did he merely deliver several blows which did not appear life-threatening, and Dewone's death was not a rare phenomenon. Rather, defendant attacked Dewone with a gang of eight or nine boys, severely beat Dewone for five minutes, punching and stomping on his head, even after he lay motionless on the ground, completely defenseless. Defendant began by punching Dewone with no provocation and continued to severely beat him and stomp on his head for some time, also using the liquor bottle as a weapon, while Dewone lay defenseless on the ground.

¶ 34 Defendant argues that he "would not necessarily have known the severity of Dewone's injuries as they were internal" and that defendant thus "had no reason to suspect Dewone's injuries would be fatal." However, this argument is belied by the severity and duration of the beating, with 17 distinct injuries inflicted while defendant beat and stomped on Dewone's head, coupled with the fact that Dewone was lying on the ground motionless.

¶ 35 The evidence adduced at trial showed that by beating Dewone so severely about his head defendant "intend[ed] to kill or do great bodily harm" to Dewone (720 ILCS 5/9-1(a)(1) (West 2004)) or knew that such acts create a strong probability of death or great bodily harm (720 ILCS 5/9-1(b) (West 2004)) and did not merely "consciously disregard[] a substantial and unjustifiable risk" (720 ILCS 5/4-6 (West 2004)) that his actions were "likely to cause death or great bodily harm" (720 ILCS 5/9-3(a) (West 2004)).

¶ 36 Defendant also argues that the trial court, "in agreeing to give the definition of recklessness must have found, on some level, that the evidence warranted the jury's consideration of that mental state." The court stated the following to defense counsel in discussing the recklessness instruction and stated its reasoning as follows:

"Are you going to argue at most recklessness, or are you going to incorporate it in your argument to the jury recklessness even though there is no instruction or verdict form on it?

And I just say that–if you're going to argue [the] State has not proved knowledge, they may have or they have shown the recklessness [*sic*], or my client's conduct was reckless but not knowing or intentional, I will also give a definition of recklessness.

If you're not going to argue it, then I won't give a reckless definition, just knowledge."

Defense counsel indicated he would argue recklessness, and thus the court gave the instruction of the definition of recklessness.

¶ 37 However, the court was explicit in its findings that the evidence did not support an involuntary manslaughter instruction. As discussed, the court did not abuse its discretion in refusing the involuntary manslaughter instruction. Defendant does not argue that the definitional instruction on recklessness confused the jury or that any error resulted from the giving of this instruction.

¶ 38    Defendant also points out that at sentencing the trial court stated that the evidence showed defendant did not intend to kill Dewone and that defendant was probably surprised that he caused Dewone's death. Notwithstanding the trial court's comments that defendant did not intend to kill Dewone, the trial court did not find that defendant did not intend his actions which resulted in Dewone's death, nor did it find that defendant did not intend to cause great bodily harm or create a strong probability of great bodily harm. Thus, the court's comments in no way undermine its findings that the evidence did not support an involuntary manslaughter instruction. Dewone's severe multiple wounds and his defenselessness established that defendant's conduct was not merely reckless. There was no evidence to support an involuntary manslaughter instruction. We find no abuse of discretion in the court's refusal to give an involuntary manslaughter instruction.

¶ 39                    II. Instruction on Definition of Knowledge

¶ 40    Defendant next argues that the trial court erred in refusing to instruct the jury on the definition of knowledge contained in the second paragraph of IPI Criminal 4th No. 5.01B. We review the trial court's decision to give a particular jury instruction for an abuse of discretion. *People v. Dorn*, 378 Ill. App. 3d 693, 698 (2008) (citing *People v. Daniels*, 287 Ill. App. 3d 477, 485 (1997)).

¶ 41    The State argues that because murder is a general intent crime, which requires only that defendant intentionally committed his actions which resulted in the victim's death, it was unnecessary to prove that defendant intended the precise harm which resulted. Defendant maintains that he was also charged with knowing murder, for which the State had to prove that defendant knew that his actions had a strong probability of death or great bodily harm.

¶ 42    The relevant provisions of IPI Criminal 4th No. 5.01B state as follows:

"5.01B Knowledge–Willfulness

[1] A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

[2] A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct." IPI Criminal 4th No. 5.01B.

¶ 43    The committee note to IPI Criminal 4th No. 5.01B advises the use of either or both paragraphs in the following manner:

"If given, it should only be given when the result or conduct at issue is the result or conduct *** described by the statute defining the offense.

In cases where the instruction is given, use paragraph [1] if the offense is defined in terms of prohibited conduct. Use paragraph [2] if the offense is defined in terms of a prohibited result. If both conduct and result are at issue, use *both* paragraphs [1] and [2]." (Emphasis in original.) IPI Criminal 4th No. 5.01B, Committee Note.

¶ 44    Over defendant's objection, the court gave only the first paragraph of IPI Criminal

-11-

4th No. 5.01B, which read:

> "A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists."

¶ 45   The court refused defendant's instructions 6 and 7 based on the second paragraph of IPI Criminal 4th No. 5.01B. The court relied on the committee notes and decided the following:

> "Paragraph 1 will be given because as the committee note indicates, we are talking about prohibited conduct, striking, kicking, stomping, hitting the victim over the head with a bottle. This is prohibited conduct. This is 5.01B1."

¶ 46   The committee comments cite to *People v. Lovelace*, 251 Ill. App. 3d 607 (1993), where the trial court committed reversible error by giving the jury only paragraph 1, and not both paragraphs 1 and 2, because both conduct and result were at issue. In *Lovelace*, the defendant was charged with two types of aggravated battery: causing great bodily harm and battery of a peace officer. *Lovelace*, 251 Ill. App. 3d at 609. The *Lovelace* court found both result and conduct were at issue "because the indictment charged [the] defendant with both aggravated battery by knowingly causing great bodily harm and aggravated battery of a peace officer with the underlying battery based on knowingly causing bodily harm," and thus both paragraphs had to be given. *Lovelace*, 251 Ill. App. 3d at 619.

¶ 47   In *People v. Griffin*, 351 Ill. App. 3d 838 (2004), relied upon by defendant, the State charged defendant with first degree murder under section 9-1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(2) (West 2000)), alleging that she "knowingly performed the acts that caused [the victim's] death when she forcefully pressed his face and chest into her chest, causing him to suffocate, knowing such acts created a strong probability of death or great bodily harm." *Griffin*, 351 Ill. App. 3d at 839-40. The *Griffin* court held that instructing the jury only with the first paragraph of IPI Criminal 4th No. 5.01B was error because there was no dispute over whether the defendant performed the acts that caused the victim's death; only the defendant's mental state when she performed those acts was at issue. *Griffin*, 351 Ill. App. 3d at 854. The court explained that "in addition to being instructed that to find defendant guilty, the jury had to find that she 'knew' that her acts created a strong probability of death or great bodily harm to Joseph, the jury needed to know that defendant 'knew' what the result of her conduct would be if she was consciously aware 'that such result [(namely, Joseph's death) was] practically certain to be caused' by her conduct." *Griffin*, 351 Ill. App. 3d at 854-55.

¶ 48   Our reasoning in *People v. Botsis*, 388 Ill. App. 3d 422 (2009), is instructive. The defendant in *Botsis* was charged with and tried for aggravated reckless driving, which requires the mental state of recklessness. *Botsis*, 388 Ill. App. 3d at 440. The trial court provided the jury with paragraphs 1 and 3 of IPI Criminal 4th No. 5.01B, but refused to give paragraph 2. *Botsis*, 388 Ill. App. 3d at 440. We affirmed and reasoned as follows:

> "Here, defendant's indictment charged him with willfully and wantonly disregarding the safety of others when he drove while aware of his mental condition 'thereby causing great bodily harm.' The State was not required to prove defendant *knew* his conduct

-12-

would result in great bodily harm. That is, the offense does not require proof that the defendant knew a certain result would occur." (Emphasis in original.) *Botsis*, 388 Ill. App. 3d at 441.

¶ 49    Here, the indictment was for two counts of first degree murder. In count I of the indictment, defendant was charged as follows:

"WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY HIT AND KICKED DEWONE MCCLENDON ABOUT THE HEAD AND KILLED DEWONE MCCLENDON WITH BLUNT FORCE TRAUMA, IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(A)(1) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED."

¶ 50    The second count in the indictment for first degree murder stated that defendant:

"WITHOUT LAWFUL JUSTIFICATION, HIT AND KICKED DEWONE MCCLENDON ABOUT THE HEAD AND KILLED DEWONE MCCLENDON WITH BLUNT FORCE TRAUMA, KNOWING THAT SUCH ACTIONS CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO DEWONE MCCLENDON, IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(A)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED."

¶ 51    Our supreme court explained the different mental states required by the different subsections of the statute setting forth the offense of murder:

"Our first degree murder statute describes three mental states or conduct that can accompany the acts that cause the murder. A defendant can (1) intend to kill or do great bodily harm to the victim (intentional murder), (2) know that his acts create a strong probability of death or great bodily harm to the victim (knowing murder, also known as strong probability murder), or (3) attempt or commit a forcible felony other than second degree murder (felony murder)." *People v. Davis*, 233 Ill. 2d 244, 263 (2009) (citing 720 ILCS 5/9-1(a) (West 2004)).

¶ 52    Here, count I set forth intentional murder and count II set forth knowing or strong probability murder. The first count required knowing conduct which resulted in the victim's death, and the second count required knowledge of the result of that conduct. Thus, at first blush our line of precedent represented by *Lovelace* and *Griffin* seems to indicate the trial court should have given the second paragraph of IPI Criminal 4th No. 5.01B because he was charged under count II with knowing or strong probability murder.

¶ 53    However, we note two critical distinctions between those cases and the present case. First, in *Lovelace* and *Griffin*, the defendants were charged and convicted of a crime requiring knowledge of result. We note in particular in *Griffin* the defendant was charged with, and convicted of, only knowing or strong probability first degree murder under section 9-1(a)(2) of the Criminal Code (720 ILCS 5/9-1(a)(2) (West 2000)). *Griffin*, 351 Ill. App. 3d at 839-40. Here, in contrast, defendant was charged with another count for intentional murder, under section 9-1(a)(1) of the Criminal Code (720 ILCS 5/9-1(a)(2) (West 2008)) and was convicted under a general verdict.

¶ 54    As the State correctly asserts, because the jury returned a general verdict, we presume that they found defendant guilty of the most serious offense, intentional murder. In *Griffin*

*v. United States*, 502 U.S. 46, 49 (1991), the Supreme Court held that a general verdict of guilty is valid where the evidence is insufficient to support one of several alternative means of committing the same crime in the indictment. " 'After [*Griffin v. United States*, 502 U.S. 46 (1991)], *** a general guilty verdict based on an instruction which includes different methods of committing the same offense in the disjunctive is ground for reversal only where one alternative is legally defective, *i.e.*, fails to correctly state the law, and not where the flawed alternative is factually inadequate, *i.e.*, where the evidence is insufficient to sustain that count." *People v. Griffin*, 178 Ill. 2d 65, 83-84 (1997) (quoting *People v. Griffin*, 247 Ill. App. 3d 1, 16 (1993)). A jury can properly return a single general verdict of guilty based on instructions which provide in the disjunctive alternative methods of committing a single crime, so long as those alternatives are not so divergent as to be constitutionally infirm. *Griffin*, 247 Ill. App. 3d at 13. As the appellate court explained in *Griffin*, the fact that the *mens rea* for one method of committing the offense at issue is different than the *mens rea* for another method of committing the offense is irrelevant. *Griffin*, 247 Ill. App. 3d at 13.

¶ 55    Our supreme court explained that "[o]f course, where the evidence is insufficient to support an alternative legal theory or basis of liability, it is generally preferable for a trial court to remove that theory from the jury's consideration." *Griffin*, 178 Ill. 2d at 84. " 'The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction.' " *Griffin*, 178 Ill. 2d at 84 (quoting *Griffin*, 502 U.S. at 60).

¶ 56    Even if there was any error in refusing the instruction, it was harmless under the one-good-count presumption that arises under a general verdict. See *Davis*, 233 Ill. 2d at 263 (applying harmless error to any instructional error based on the one-good-count presumption). Under the one-good-count rule established in *People v. Lymore*, 25 Ill. 2d 305, 185 N.E.2d 158 (1962), a general finding of guilt may be affirmed where proof is sufficient on one good count in an indictment. When an indictment alleges various forms for a single murder–intentional, knowing or felony murder–and a general verdict is returned, "the net effect is that the defendant is guilty as charged in each count and there is a presumption that the jury found that the defendant committed the most serious of the crimes alleged, which is intentional murder." *Davis*, 233 Ill. 2d at 263 (citing *People v. Morgan*, 197 Ill. 2d 404, 448 (2001); *People v. Cardona*, 158 Ill. 2d 403, 411 (1994); *People v. Thompkins*, 121 Ill. 2d 401, 455 (1988)). Thus, regardless of whether or not the evidence warranted the second paragraph of IPI Criminal 4th No. 5.01B regarding knowledge of result for the knowing or strong probability murder count, the fact remains that the jury returned a valid general verdict presumed to be based on the intentional murder count.

¶ 57    Defendant's only response to the State's argument regarding the one-good-count presumption is that the evidence did not support a verdict of guilty of intentional murder. However, the evidence in this case did indeed support a verdict of guilt of intentional murder. The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The evidence at trial, viewed in the light most favorable to the prosecution, established that defendant beat Dewone unprovoked with a gang of eight or nine boys while Dewone lay defenseless on the

ground, and the beating was so severe that it caused Dewone's death within minutes. Thus, we find the evidence supported a verdict of guilt of intentional murder.

¶ 58    The second distinction between the present case and the facts in *Lovelace* and *Griffin* is that in those cases the jury sent notes to the trial court specifically indicating confusion about the mental state of "knowing" and seeking guidance from the court. In *Griffin*, during jury deliberations, the jury foreman submitted a note to the trial court requesting clarification regarding mental states. *Griffin*, 351 Ill. App. 3d at 851. In *Lovelace* also, the jury sent a note to the court during its deliberations which stated: " 'we need an interpretation of "knowingly or intentionally caused bodily harm." ' " *Lovelace*, 251 Ill. App. 3d at 618.

¶ 59    We highlight the committee note to IPI Criminal 4th No. 5.01B, which states the following:

"The Committee takes no position as to whether this definition should be routinely given *in the absence of a specific jury request*. See *People v. Powell*, 159 Ill. App. 3d 1005, 512 N.E.2d 1364, 111 Ill. Dec. 727 (1st Dist.1987), for the general proposition that the words 'intentionally' and 'knowingly' have a plain meaning within the jury's common understanding.' " (Emphasis added.) IPI Criminal 4th No. 5.01B, Committee Note.

¶ 60    Here, the only note from the jury was whether it could find defendant guilty of another charge, such as second degree murder. There was no specific jury request indicating confusion about mental states. Given the committee note, we do not feel this is an appropriate case to hold that the second paragraph of IPI Criminal 4th No. 5.01B was required. As the committee note suggests, "intentionally" and "knowingly" have a plain meaning commonly understood by jurors. Thus, the trial court did not abuse its discretion in refusing to give paragraph 2 of IPI Criminal 4th No. 5.01B.

¶ 61    Furthermore, we find no reversible error because the trial court gave the appropriate instructions which correctly stated the law for each method of murder. The court gave definitional instruction IPI Criminal 4th No. 7.01 on first degree murder, which provides the methods of committing first degree murder and *mens rea* for each in the disjunctive:

"A person commits the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual or another;

or

he knows that such acts will cause death to that individual or another;

or

he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

¶ 62    The court also gave issues instruction IPI Criminal 4th No. 7.02, which read, in relevant part:

"To sustain the charge of first degree murder, the State must prove the following propositions:

First: That the defendant, or one for whose conduct he is legally responsible,

-15-

performed the acts which caused the death of Dewone McClendon; and

Second: That when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Dewone McClendon;

or

he knew that his acts would cause death to Dewone McClendon;

or

he knew that his acts created a strong probability of death or great bodily harm to Dewone McClendon."

¶ 63    There is no ground for reversal of a general verdict if the instructions correctly stated the law for an alternate means of committing murder. See *People v. Blue*, 343 Ill. App. 3d 927, 938 (2003) (where a general verdict was returned for counts for intentional and felony murder and the trial court gave IPI Criminal 4th No. 7.02, which correctly stated the law for felony murder, the felony murder counts were not legally defective and thus reversal was not required under *Griffin*, 247 Ill. App. 3d 1). See also *People v. Dibble*, 317 Ill. App. 3d 252, 257 (2000) (where instructions correctly stated the law, but there was insufficient proof of one of the theories, the court assumed that the jury convicted the defendant under one or both of the theories of first degree murder that were supported by the evidence).

¶ 64    We thus conclude that: (1) even if there had been any error in the trial court's decision, it was harmless in light of the one-good-count presumption that arises under a general verdict. See *Davis*, 233 Ill. 2d at 263 (applying harmless error to any instructional error based on the one-good-count presumption); (2) there was no error in refusing to give the second paragraph of IPI Criminal 4th No. 5.01B in this case where the jury did not indicate any confusion about mental states; and (3) there was no error where the court correctly instructed the jury on the alternate methods of committing first degree murder.

¶ 65                        III. Failure to Question Jurors Regarding *Zehr* Principles

¶ 66    Defendant next asserts that the court erred in not questioning the venire regarding the principles articulated in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1064 (1984). In *Zehr*, our supreme court set forth the requirement that, when requested by the defendant, a trial court must question prospective jurors during *voir dire* regarding the State's burden of proof, the presumption of the defendant's innocence, the defendant's right not to testify on his own behalf, and that a defendant's failure to testify cannot be held against him. *Zehr*, 103 Ill. 2d at 477-78, 469 N.E.2d at 1064. Amended Supreme Court Rule 431(b) now makes *Zehr* mandatory and provides:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the

defendant objects.

> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 67 The State argues that defendant forfeited this issue by failing to raise it either at trial or in a posttrial motion. Defendant maintains that despite trial counsel's failure to raise the issue, it is not forfeited because the amended version of Supreme Court Rule 431 requires the trial court to comply with the rule and defendant did not need to object or include the issue in a posttrial motion. Defendant alternatively maintains that the plain error doctrine applies.

¶ 68 Generally, a defendant must object to claimed errors at trial and raise them in his posttrial motion; otherwise, they are procedurally defaulted or forfeited. *People v. Naylor*, 229 Ill. 2d 584, 602 (2008). Despite defendant's insistence that preserving the error was unnecessary, a defendant's failure to object to the trial court's failure to comply with Rule 431(b) or include that issue in his posttrial motion results in forfeiture of appellate review of the claim. *People v. Thompson*, 238 Ill. 2d 598, 612 (2010). Thus, defendant has forfeited his *Zehr* claim by failing to contemporaneously object at trial and raise the issue in his posttrial motion.

¶ 69 Nevertheless, the plain error doctrine applies. The State cites *People v. Hammonds*, 399 Ill. App. 3d 927 (2010), which applied a harmless error analysis. However, the supreme court directed that this court's decision in *Hammonds* be vacated, and we were directed to reconsider our judgment in light of *Thompson*. People v. Hammonds, No. 110584 (Jan. 26, 2011) (supervisory order). The supreme court held in *Thompson* that when a defendant has forfeited review of an issue, we consider only plain error; harmless error applies when a defendant has preserved error. *Thompson*, 238 Ill. 2d at 611 (citing *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009)).

¶ 70 The plain error doctrine permits courts to consider otherwise forfeited claims when: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 71 We analyze first whether defendant satisfied the first prong of the plain-error exception. Here, the trial court admonished the jury as to most of the required Rule 431(b) *Zehr* principles:

> "Now Jurors, at this time I would like to go over with you some basic fundamental principles of American constitutional and criminal law which would guide and govern our case. Please listen as I go over these basic tenants [*sic*]. And then I will ask you if there is any juror who sincerely feels they cannot follow any one of them or all of them.

> Jurors, I read to you the indictment. The indictment is a mere formal document which is necessary to place the defendant on trial. It does not constitute any evidence of guilt.

> Indeed under the law in this country, this defendant and every defendant charged with

a crime is presumed to be innocent of the charge against him. This presumption of innocence is fundamental to our system. Every defendant in America is presumed to be innocent of the charge against him.

*The presumption of innocence rests with the defendant now*. It remains with him throughout every stage of the trial, and even at the end of the case while you deliberate on your verdict. And the presumption of innocence is not overcome unless and until the time arrives when you are convinced beyond a reasonable doubt that he is guilty.

Jurors, that is the burden of proof in this case. *The State must prove the defendant guilty beyond a reasonable doubt*. This burden rests with the State, remains with the State. It never shifts to a defendant. The defendant may never be called upon to prove innocence.

\* \* \*

Jurors, the State would arrest [*sic*] their case probably on Wednesday. And the defense then may or may not choose to present a case. Again, the defendant has no burden. If the defense chooses to present a case, they may do so just like the State did.

If a defense called–If the defense calls a witness, the witness will be placed under oath to tell the truth and subject to cross examination by the Assistant State's Attorneys. If the defendant chooses to testify, his testimony must be judged in the same manner as any other witness. *If the defendant chooses not to testify, that in no way may be considered against him*.

\* \* \*

Now, is there any juror who feels honestly and sincerely that they cannot follow any of the basic principles I just talked about, such as presumption of innocence, burden of proof? Any juror who feels a dispute and cannot follow one of these principles? If so, please stand and tell me your name \*\*\* please." (Emphasis added.)

¶ 72  Thus, the court clearly admonished the jury (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; and (3) that defendant's failure to testify cannot be held against him. However, the court was not clear in admonishing the jury of the remaining principle that the defendant is not required to offer any evidence on his or her own behalf. See Ill. S. Ct. R. 431(b)(3) (eff. May 1, 2007). The court attempted to delineate this principle by stating that: "the defense then may or may not choose to present a case. Again, the defendant has no burden." Although this language is close to the language of Rule 431(b), it does not track the clear language of the rule that "the defendant is not required to offer any evidence on his or her own behalf." Ill. S. Ct. R. 431(b)(3) (eff. May 1, 2007). The language of Rule 431(b) makes it emphatically clear that the defendant is not required to offer any evidence, and not merely that the defendant has a choice whether to present evidence, as the trial court's comments below state.

¶ 73  The court also did not conduct the required *voir dire* examination and ask each of the potential jurors whether he or she understands and accepts each of the Rule 431(b) principles. Rule 431(b) requires a specific question and response process where the trial court must ask each potential juror whether he or she understands and accepts each of the principles in the

rule. *Thompson*, 238 Ill. 2d at 607. "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607. Here the trial court merely asked whether there is "any juror who *feels honestly and sincerely that they cannot follow* any of the basic principles I just talked about, such as presumption of innocence, burden of proof[.] Any juror who *feels a dispute* and *cannot follow* one of these principles?" (Emphasis added.) Questioning of this sort does not comply with Rule 431(b). Our supreme court has made clear that "trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Thompson*, 238 Ill. 2d at 607 (quoting Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997)). Here the trial court merely asked general questions regarding the jurors' willingness to follow the law and did not question whether they both understood and accepted each of the principles. Thus, the court below violated Supreme Court Rule 431(b). See *Thompson*, 238 Ill. 2d at 607 (held the trial court violated Rule 431(b) for failing to question whether the potential jurors both understood and accepted each of the enumerated principles).

¶ 74     We note that the better practice would be if trial courts were to simply admonish potential jurors as Rule 431(b) is written. As noted in *Thompson*, "[t]he language of Rule 431(b) is clear and unambiguous." *Thompson*, 238 Ill. 2d at 607. The rules promulgated by our supreme court carry with them the force of law; they are not aspirational and are intended to be adhered to as written. See *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995). This means that trial courts should advise jurors of each of the four *Zehr* principles as written in the rule, as well as ask if the jurors understand and accept each of the principles, after each principle is read. These are two distinct concepts, and jurors should be questioned in two parts: first, whether they understand each principle; and, second, whether they accept each principle. "The rule requires questioning on whether the potential jurors *both understand* and *accept* each of the enumerated principles." (Emphasis added.) *Thompson*, 238 Ill. 2d at 607. We note also that Rule 431(b) requires that trial courts ask "each *potential juror*" regarding their understanding and acceptance of each principle, thus indicating that the venire must be examined during *voir dire*, before the jury is empaneled. See Ill. S. Ct. R. 431 (eff. May 1, 2007).

¶ 75     However, although the trial court committed error, the evidence in this case was not closely balanced. Every witness testified to substantially the same sequence of events in which defendant and a large group of eight or nine boys, without provocation, beat Dewone. Nearly every witness testified that defendant punched Dewone as Dewone was walking away, and continued not only punching Dewone, but also stomping on his head while Dewone lay motionless on the ground. Although several witnesses recanted their specific identification of defendant and description of his actions at trial, these witnesses' earlier statements and grand jury testimony corroborated the testimony of all the other witnesses at trial. Thus, the evidence overwhelmingly implicated defendant and established his guilt. Therefore, defendant has not established the first prong of plain error review.

¶ 76     Defendant also does not satisfy the second prong of the plain error doctrine. In *Thompson*, our supreme court discussed, at length, whether a trial court's violation of

amended Rule 431(b) rises to the level of plain error specifically under the second prong of plain error analysis and concluded:

"Our amendment to Rule 431(b) does not indicate that compliance with the rule is now indispensable to a fair trial. As we have explained, the failure to conduct Rule 431(b) questioning does not necessarily result in a biased jury, regardless of whether that questioning is mandatory or permissive under our rule. Although the amendment to the rule serves to promote the selection of an impartial jury by making questioning mandatory, Rule 431(b) questioning is only one method of helping to ensure the selection of an impartial jury. See [*People v.*] *Glasper*, 234 Ill. 2d [173,] 195-96 [(2009)]. It is not the only means of achieving that objective. A violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of this court's rules. *Glasper*, 234 Ill. 2d at 193. Despite our amendment to the rule, we cannot conclude that Rule 431(b) questioning is indispensable to the selection of an impartial jury.

In this case, the prospective jurors received some, but not all, of the required Rule 431(b) questioning. The venire was also admonished and instructed on Rule 431(b) principles. Defendant has not established that the trial court's violation of Rule 431(b) resulted in a biased jury. Defendant has, therefore, failed to meet his burden of showing the error affected the fairness of his trial and challenged the integrity of the judicial process. Accordingly, the second prong of plain-error review does not provide a basis for excusing defendant's procedural default." *Thompson*, 238 Ill. 2d at 614-15.

¶ 77     Thus, under *Thompson*, a violation of Rule 431(b)'s requirement to advise and question a jury as to the *Zehr* principles is not an error so serious that it affected the fairness of the trial, and thus, it does not rise to the level of plain error. Therefore, we find defendant forfeited the issue and has failed to establish any error sufficient to invoke the plain error exception to allow review.

¶ 78                          IV. Admission of Prior Inconsistent Statements

¶ 79     We next address defendant's argument that the trial court should have admitted only one prior consistent statement per each witness who recanted his or her prior statement at trial. According to defendant, admitting more than one prior consistent statement violated the common law prohibition against prior consistent statements and deprived him of a fair trial. Defendant argues that the introduction of both signed statements given to police and grand jury testimony, though each was inconsistent with trial testimony, were consistent with each other, and the admission of these cumulative consistent statements unfairly bolstered their content and was prejudicial.

¶ 80     Though defendant calls the statements prior consistent statements because they are consistent with each other, they are in fact prior inconsistent statements, as the witnesses recanted both their prior signed statements to the police and their prior sworn testimony before the grand jury. The consistency of statements is measured against a witness's trial testimony, not against each other; inconsistent statements are inconsistent with trial testimony; consistent statements are consistent with it. *People v. Johnson*, 385 Ill. App. 3d

585, 608 (2008). The rule against prior consistent statements exists because they needlessly bolster a witness's trial testimony, but inconsistent statements cannot bolster a witness's trial testimony and, thus, application of the rule makes no sense in this context. *Johnson*, 385 Ill. App. 3d at 608. At best, defendant's argument can be cast as an argument that the introduction of more than one prior inconsistent statement was cumulative or prejudicial and denied him a fair trial.

¶ 81 However, even assuming *arguendo* that defendant is claiming the admission of the statements was erroneous because they were cumulative here, again, defendant has forfeited this issue for review. A defendant must object to claimed errors at trial and raise them in his posttrial motion or they are forfeited. *Naylor*, 229 Ill. 2d at 602. The only objection to Jamal's testimony concerning his prior signed statement to the State's Attorney was on the basis that it was nonimpeaching. The trial court sustained one such objection to questioning about Jamal's prior statement that he saw striking with the liquor bottle. During Harry Hardy's testimony concerning his prior inconsistent statements, defense counsel raised only one objection "to the content of the question, not the statement." The only objection to DeAndre's testimony about his prior inconsistent statement to the State's Attorney was that it was nonimpeaching. There was thus no objection to these witnesses' testimony on hearsay grounds that the statements were cumulative prior inconsistent statements and prejudicial. Defendant also failed to preserve the issue in his posttrial motions.

¶ 82 As defendant forfeited the issue by failing to object and failing to include the issue in his posttrial motions, defendant must show plain error in that either: "(1) a clear or obvious error occurred and the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error [was] so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *People v. Herron,* 215 Ill. 2d 167, 186-87 (2005)). "However, before invoking the plain error exception, 'it is appropriate to determine whether error occurred at all,' because without error, there can be no plain error. [Citation.]" *People v. Smith*, 372 Ill. App. 3d 179, 181, 865 N.E.2d 502, 504 (2007). "Generally, evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court abused that discretion." *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006). We thus apply plain error review here to an issue that already carries an abuse of discretion standard. *People v. Johnson*, 385 Ill. App. 3d 585, 596 (2008).

¶ 83 Defendant fails to invoke our review under the plain error exception because there was no error in admitting the prior statements. Here, the prior inconsistent statements were admissible not only for impeachment but also as substantive evidence. Pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/100-1 *et seq.* (West 2008)), prior inconsistent statements are admissible as substantive evidence where the witness is subject to cross-examination and the statements were made under oath or signed by the witness. Section 115-10.1 provides the following:

> "§ 115-10.1. Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement–

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding[.]" 725 ILCS 5/115-10.1 (West 2008).

¶ 84    Under this definition, both the witnesses' prior signed statements given to police and their grand jury testimony are prior inconsistent statements admissible not just for impeachment but also substantively as exceptions to the hearsay rule.

¶ 85    We find *Johnson* and *People v. Maldonado*, 398 Ill. App. 3d 401 (2010), *appeal denied*, 236 Ill. 2d 565 (2010), dispositive of this issue. In *Johnson*, the defendant claimed the trial court erred by admitting both grand jury testimony and a prior written statement, permitting several witnesses to testify about the statements, and admitting the entirety of the statements, although some parts were consistent with the witness's trial testimony. *Johnson*, 385 Ill. App. 3d at 607. To the extent defendant preserved any argument in his second motion for a new trial that the trial court committed error in admitting portions of the prior statements that were consistent with trial testimony, here the bulk of the prior statements, notably identification of defendant and the description of defendant's involvement, was inconsistent. In *Johnson* we affirmed the admission of the entirety of the prior inconsistent statements, even though parts were consistent. See 385 Ill. App. 3d at 607. After explaining that in fact the admitted statements were both inconsistent with the witness' trial testimony, we found "no merit" to the defendant's claim of cumulative prior consistent statements. *Johnson*, 385 Ill. App. 3d at 609.

¶ 86    Defendant asserts *Johnson* was "poorly reasoned" and urges us to reject its holding. However, in *Maldonado* we recently reiterated our holding in *Johnson* and continue to follow it. In *Maldonado* the trial court allowed both a witness's handwritten and signed statements, and his grand jury testimony. The defendant in *Maldonado* made the same argument defendant makes here: that the admission of one statement that is inconsistent with a witness's trial testimony is proper, but the introduction of multiple statements that are inconsistent with the trial testimony but consistent with each other creates the bolstering effect that is prohibited by the rule against the introduction of prior consistent statements. *Maldonado*, 398 Ill. App. 3d at 423. After reiterating our holding in *Johnson* explaining that the defendant was confusing prior consistent statements with prior inconsistent statements, we specifically held that "the introduction of more than one statement that is inconsistent with a witness's trial testimony, whether or not such statements are consistent with each other, is proper." *Maldonado*, 398 Ill. App. 3d at 423.

¶ 87     Also, here the introduction of the prior inconsistent statements as substantive evidence was proper. See *People v. Modrowski*, 296 Ill. App. 3d 735 (1998) (the prosecution was properly permitted to admit into evidence a witness's grand jury testimony as substantive evidence because the witness's trial testimony contradicted his earlier statements to the detriment of the prosecution's case); *People v. Thomas*, 354 Ill. App. 3d 868 (2004), *appeal denied*, 215 Ill. 2d 616 (2005) (where a witness recanted statements and testimony given at the witness's prior trial, the prior inconsistent statements were properly admitted as substantive evidence implicating defendant on charges of murder and aggravated kidnapping). Thus, there was no error and we conclude there was no plain error.

¶ 88                   V. Credit for Time Served From Date of Arrest in Minnesota

¶ 89     Lastly, defendant maintains that he was entitled to credit for time served from the date of his arrest in Minnesota, December 28, 2005. Defendant was sentenced on March 26, 2008. The mittimus reflected only 706 days credit for time served. The State concedes the issue and requests that we correct the mittimus. A defendant is entitled to sentencing credit for "time spent in custody as a result of the offense for which the sentence was imposed." 730 ILCS 5/5-8-7(b) (West 2008). " '[O]nce a defendant is arrested for an offense[,] he or she is clearly "in custody" for that offense even before he or she is formally charged.' " *People v. Coleman*, 391 Ill. App. 3d 963, 984 (2009) (quoting *People v. Roberson*, 212 Ill. 2d 430, 439 (2004)). Time spent detained in another state is credited against a defendant's sentence so long as the confinement in the other jurisdiction was a result of the offense for which defendant was sentenced. *People v. Elder*, 392 Ill. App. 3d 133, 138 (2009).

¶ 90     However, the State is correct that defendant is not entitled to credit for the day of sentencing since the mittimus is issued and effective that same day. In *People v. Williams*, 239 Ill. 2d 503 (2011), our supreme court addressed the question of whether the date of sentencing is properly classified as "time spent in custody as a result of the offense for which the sentence was imposed" under section 5-4.5-100. The court analyzed sections 5-4.5-100 and 3-6-3, of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-100, 3-6-3 (West 2008)), under which defendants are to receive one day of good-conduct credit for each day spent in presentence custody, as well as credit for each day of their sentence under section 3-6-3 and, thus, defendants will ultimately receive the same credit whether the day of his sentencing is counted under section 3-6-3 or section 5-4.5-100. *Williams*, 239 Ill. 2d at 507. The court held, "[b]ecause section 5-8-5 requires the court to commit the defendant to the Department at the time of the entry of judgment, section 5-4.5-100 means that the sentence commences upon the issuance of the mittimus," and therefore, "the date of issuance of the mittimus is a day of sentence, subject to counting under section 3-6-3." *Williams*, 239 Ill. 2d at 509. The court concluded that "the date a defendant is sentenced and committed to the Department is to be counted as a day of sentence and not as a day of presentence credit." *Williams*, 239 Ill. 2d at 510. Thus, the date of defendant's sentence and issuance of mittimus is not to be included. Defendant is entitled to credit for 819 days served.

¶ 91                                CONCLUSION

¶ 92    We conclude that defendant was not entitled to a jury instruction on involuntary manslaughter because the evidence did not support such an instruction, and thus the trial court did not abuse its discretion in refusing the instruction. Second, defendant was not entitled to the second paragraph of IPI Criminal 4th No. 5.01B where the jury returned a general verdict presumed to be based on intentional murder, and even if there was error, it was harmless under the one-good-count presumption that arises under a general verdict; where there was no specific jury request regarding mental states; and where the trial court gave the appropriate instructions which correctly stated the law for each method of murder; (3) defendant forfeited review of his claim that the trial court did not comply with *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1064 (1984), and Supreme Court Rule 431(b), and did not establish plain error because although the court violated Rule 431(b) the evidence was not closely balanced, and the violation of Rule 431(b) was not an error so serious that it affected the fairness of trial; (4) defendant forfeited review of whether the introduction of several prior inconsistent statements of witnesses was error, and there was no error because the statements were properly admitted as prior inconsistent statements; and (5) defendant is entitled to credit for time served from the date of his arrest, except the date of his sentencing since he was remanded into custody that same day. Therefore, we affirm defendant's conviction and sentence, but remand with directions to amend the sentencing judgment and correct the mittimus to reflect 819 days served by defendant prior to sentencing.

¶ 93    Affirmed as modified and remanded with directions.